J-A18030-23

2023 PA Super 217

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: WASHINGTON COUNTY CHILDREN AND YOUTH SOCIAL SERVICE AGENCY | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 159 WDA 2023 |

Appeal from the Order Entered January 30, 2023
In the Court of Common Pleas of Washington County Juvenile Division at
No(s): CP-63-DP-0000064-2022

BEFORE: BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

OPINION BY LAZARUS, J.: **FILED: OCTOBER 26, 2023**

In this dependency case, Washington County Children and Youth Social Service Agency (Agency) appeals from the juvenile court's order finding a lack of reasonable efforts[1] on behalf of the Agency to prevent removal of K.M.

_____

[1] Denial of a request for a finding of reasonable efforts is an appealable order because the denial "will result in a significant financial burden from the loss of federal funding for placement," and, thus, the Agency "is an aggrieved party with standing to appeal." **Interest of K.C.**, 156 A.3d 1179, 1182 (Pa. Super. 2017). **See** Pa.R.A.P. 501 ("Except where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom."); **In re J.G.**, 984 A.2d 541, 546 (Pa. Super. 2009) ("[A] party is 'aggrieved' when the party has been adversely affected by the decision from which the appeal is taken."). **See In Interest of S.A.D.**, 555 A.2d 123, 127 (Pa. Super. 1989) (stating there must be judicial determination that reasonable efforts were made to prevent removal and keep family intact in order for state to be eligible for federal funds where removal of child from home was result of judicial determination). **See also In re W.M.**, 41 A.3d 618, 620 (Pa. Super. 2012) (permitting CYS' appeal of "no reasonable effort" finding); Pennsylvania Dependency Benchbook, 3rd Edition (2019) (Benchbook), at 6.1, 6.6 (absent
*(Footnote Continued Next Page)*

J-A18030-23

(born 4/21), as required by subsection 6351(b) of the Juvenile Act.[2]   K.M.,

adjudicated dependent on September 26, 2022, was removed from the home

_____

finding of reasonable efforts, funding for duration of child's placement and services to family becomes solely county responsibility).

[2] **See** 42 Pa.C.S.A. §§ 6301 *et seq*.  Subsection 6351(b) provides:

(b) Required preplacement findings.--Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:

(1) that continuation of the child in his home would be contrary to the welfare, safety[,] or health of the child; and

**(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition**; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or

(4) if the court has previously determined pursuant to section 6332 (relating to informal hearing) that reasonable efforts were not made to prevent the initial removal of the child from his home, whether reasonable efforts are under way to make it possible for the child to return home; and

(5) if the child has a sibling who is subject to removal from his home, whether reasonable efforts were made prior to the placement of the child to place the siblings together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

The court shall not enter findings under paragraph[s] (2), (3) or (4) if the court previously determined that aggravated circumstances exist and no new or additional reasonable efforts to

*(Footnote Continued Next Page)*

- 2 -

on August 11, 2022, following the death of his infant sibling, N.M. (born 4/22).

**See** Order of Adjudication and Disposition, 9/26/22. After our review, we conclude that the court's decision is supported by competent evidence of record. The trial court noted that, while the "liability and accountability of the parent[s'] actions cannot be dismissed, the monumental failures of the Agency demand a finding of no reasonable efforts."[3] Order, 1/9/23. The record supports the court's findings that the Agency, during the four months it was involved with this family, failed to

> follow [its] own policies, failed to adequately assess the family's needs, took 'empty' actions, and failed to follow up [and, further, that t]he Agency's failure permitted the circumstances in the home to fester and deteriorate, culminating in the death of [K.M.'s] infant sibling and likely forever denying K.M. the opportunity to be in the care of his parents.

---

> prevent or eliminate the need for removing the child from the home or to preserve and reunify the family are required.

42 Pa.C.S.A. § 6351(b) (emphasis added). **See also** 42 Pa.C.S.A. § 6332(a) (if child is alleged to be dependent, court or master shall also determine whether reasonable efforts were made to prevent such placement).

[3] These initial efforts, made prior to adjudication, and the court's "preplacement" findings, are distinguished from those future findings of reasonable efforts related to parental compliance and progress with a family service plan. **See** Benchbook, **supra** at 6.1.1 (initial reasonable efforts determination distinct from future finding related to parents' compliance and progress); **cf. In re D.C.D.**, 105 A.3d 662 (Pa. 2014) (provision or absence of reasonable efforts may be relevant to court's consideration of both grounds for termination and best interest of child). The focus, at this preplacement or pre-removal stage, as acknowledged by the Agency, is not on the parents. **See** Appellant's Brief, at 19. "At the shelter, adjudication[,] and disposition hearings, 'reasonable efforts' findings focus on **steps taken to prevent or eliminate the need for child removal**." Benchbook, **supra** at 20.3 (emphasis added).

Pa.R.A.P. 1925(a) Opinion, 3/15/23, at 1. We, therefore, affirm the court's order, relying, in part, on the opinion authored by the Honorable Traci L. McDonald.

The Agency raises two issues for our review:

1. Whether the lower court committed an error of law or abused its discretion by failing to render a decision relating to reasonable efforts to prevent placement within sixty (60) days of the date of adjudication?

2. Whether the lower court erred in concluding that [the Agency] failed to exercise reasonable efforts to prevent the placement of the minor child, K.M.

Appellant's Brief, at 5.

The Agency first argues that the trial court erred because its finding of no reasonable efforts was not rendered within 60 days of K.M.'s adjudication. This claim is waived.

On September 26, 2022, the court adjudicated K.M. dependent, but suspended that order pending a hearing at which the court ordered the Agency to address various deficiencies. The order stated that the court

defers finding on Reasonable Efforts inasmuch as parent[s'] counsel and [guardian *ad litem*] (GAL) are requesting additional hearing time to introduce further testimony and evidence for this [c]ourt's consideration as to whether allowing the child to remain in the home would be contrary to the child's welfare, and that [p]reventive services were not offered due to the necessity for emergency placement. Following additional testimony and evidence, should this [c]ourt determine that preventive services were not provided and/or were not appropriately provided, this [c]ourt shall determine if the lack of services was reasonable under the circumstances and whether the level of effort was

- 4 -

reasonable due to the emergency nature of the situation, safety considerations, and circumstances of the family. Such determination shall be made through amended order.

Order, 9/26/22.

The Agency agreed to proceed with testimony on September 26, 2022 and October 3, 2022. Additional testimony was taken on October 19, 2022, at the Agency's request. On January 9, 2023, the court issued its order finding a lack of reasonable efforts, and the Agency filed a motion for reconsideration. On January 27, 2023, the court held a hearing on that motion. At the hearing, the Agency acknowledged that the September 26, 2022 order was suspended, thus giving the Agency the opportunity to rectify any findings of lack of reasonable efforts. *See* N.T. Hearing, 1/27/23, at 6. Additionally, at the conclusion of the reconsideration hearing, the Agency abandoned its position, requesting the court make its January 9, 2022 order final. *See id.* at 72-73 ("[W]e would prefer to forego the opportunity to cure the reasonable efforts for you to make a determination and to issue—or to include that it's a final and appealable order.").

In its Rule 1925(a) opinion, the trial court acknowledged that its finding of lack of reasonable efforts to prevent removal of K.M. from the home "was issued in excess of sixty (60) days from the stipulated adjudication date[.]" Pa.R.A.P. 1925(a) Opinion, 3/15/23, at 2. However, the court emphasized that this was with the consent of all parties "to provide for an opportunity for additional discovery and testimony." *Id.* at 3, citing N.T. Adjudication Hearing Vol. I, 9/26/22, at 154-56. At no time prior to filing its Rule 1925(b)

statement, at any of the hearings, in its motion for reconsideration, or at the hearing on that motion, did the Agency raise this issue. *See* Pa.R.A.P. 1925(b) Statement, 2/7/23.

"It is axiomatic that claims that were not raised in the trial court may not be raised for the first time on appeal." ***In re S.C.B.***, 990 A.2d 762, 767 (Pa. Super. 2010), citing ***Jahanshahi v. Centura Development Co., Inc.***, 816 A.2d 1179, 1189 (Pa. Super. 2003); Pa.R.A.P. 302(a). Here, the Agency's failure to raise this issue before the trial court renders it waived for purposes of appeal.

Moreover, even if not waived, we agree with the GAL's argument that it was the Agency's obligation to obtain the reasonable efforts finding. ***See*** Benchbook, ***supra*** at 6.1.1 ("**The agency has 60** days from the date of initial removal from the home to obtain a reasonable efforts finding.") (emphasis added). "If a reasonable efforts finding does not occur within 60 days of initial removal, federal funds cannot be claimed for the duration of the child's placement and funding of such becomes solely a county responsibility." ***Id.*** ***See also*** 45 C.F.R. § 1356.21(b)(1)(i) ("judicial determination as to whether reasonable efforts were made[] must be made no later than 60 days from the date the child is removed from the home").[4]

_____

[4] We note that the Agency's argument is that the court should have rendered its finding within 60 days of *adjudication*. However, the case law, the federal regulations, and the Benchbook measure this time period from the date of *removal* of the child. Here, K.M. was removed on August 11, 2022, and he was adjudicated dependent on September 26, 2022.

Next, the Agency argues that the trial court erred in concluding that the

Agency failed to exercise reasonable efforts to prevent the placement of K.M.

Our standard and scope of review in dependency cases is well-settled:

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re E.P.*, 841 A.2d 128, 131 (Pa. Super. 2003) (citation omitted).

[N]either federal nor Pennsylvania law defines "reasonable efforts." Notwithstanding the lack of a legal definition, we discern the following from prior cases. Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. By requiring only "reasonable efforts" [], the statute recognizes that there are practical limitations to such efforts.

*In Interest of C.K.*, 165 A.3d 935, 941-42 (Pa. Super. 2017) (footnote and

citations omitted).

Instantly, the Agency received a referral when Mother tested positive

for THC at K.M.'s birth in April 2021. Mother had limited prenatal care and

smoked marijuana throughout her pregnancy.[5]  The Agency also had drug-related concerns regarding Father and his other children—most recently in October 2021, when Father allegedly used and sold an illicit substance, resulting in permanent legal custodianship of his other children.  These cases were ultimately closed, even though Father refused to drug test or undergo drug and alcohol evaluation with respect to an October 2021 referral.[6]

_____

[5]  The Closing Summary notes indicated that Mother was severely underweight and unable to eat due to pregnancy-related nausea and

> THC allowed her to eat and gain weight appropriately during her pregnancy.  [Mother] has no prior drug and alcohol abuse issues.  [Mother] has no criminal history.  [Mother] did graduate from high school, [with] no additional education.  [Mother] is currently on maternity leave from Wal-Mart.
>
> [Father] is very apprehensive about communicating/participating with CYS.  [He has a p]rior case [history] with the agency.  He has other children [and h]e is the biological father of [K.M.].  He has previously been incarcerated, which was when he was given visitation rights to his other children.  The other children live with their biological mother and [maternal grandmother].  [Father] was released from jail in May 2020.  He  was to be on probation for 7 months, [until] Dec 2020.
>
> [K.M.] is currently safe in the home—his needs are being met.  The home has been maintained and no safety threats have been identified.  The home has no visible safety threats—the utilities are in working order and there is plenty of food in the home.

Contact Summary-Closing Summary, 6/15/21.

[6] A subsequent contact summary report listed Father's criminal history:

> 2013-  Driving Under The Influence At The Highest Rate Of Alcohol (M 1). 2016- Simple Assault (M2). 2017- Accidents Involving Death Or Personal Injury ( M2).  2018- False Identification To Law

*(Footnote Continued Next Page)*

The instant case stems from Mother testing positive for opiates at N.M.'s birth in April 2022, one year after K.M.'s birth. From that point, until N.M.'s death on August 11, 2022, the Agency worked with the family. The trial court's finding of a lack of reasonable efforts is a product of extensive review of the Agency's investigations and interventions, its systemic shortcomings, its efforts during the course of those four month, and, primarily, the reasonableness of those efforts given the Agency's knowledge of Father's history, Mother's accelerating drug issues, and the clear deterioration of the family's home and finances, all of which posed a safety threat to both K.M. and N.M.

_____

Enforcement Authorities ( M3). 2019- Possession Of A Controlled Substance By An Unregistered Person Except By Prescription is Unlawful (M), Flight To Avoid Apprehension Trial Or Punishment(M2), Escape (M2).

Contact Summary, 10/8/21. Contact summary reports on October 14, 20, 27, and November 3 and 4 of 2021 contained the following repeated information: allegations of Father's drug use, [and] Father refusing drug and alcohol evaluation. The November 4, 2021 report noted a caseworker "told [Mother and Father] their case would be getting closed." Contact Summary Report, 11/4/21. The Closing Summary Report set forth the allegations underlying acceptance of this case for assessment on October 4, 2021:

X reported [F]ather sells cocaine, heroin, and pain pills. X reported [F]ather has all this money in his bank account and does not work. X reported the drugs were just sitting out on the table. X reported the drugs were in reach of the children. X reported [F]ather is also abusing his pain pills along with selling them. X reported [F]ather is on probation. X reported [F]ather violated probation today by getting into a physical altercation. X reported there is concern that [M]other is using drugs also. X reported there are drugs hidden all over the home. X reported there are concerns with someone going to the home alone.

Casework Supervisor Amber Gaulthier stated in the Agency's CAPS Notes[7] that after N.M.'s birth, a safety assessment was to be completed within 72 hours. The case was assigned to Caseworker Jennifer Schilken, who contacted Mother the day after N.M.'s birth. ***See*** N.T. Adjudicatory Hearing, 9/26/22, at 32. Mother was in Magee Women's Hospital (Magee) and was receiving drug and alcohol treatment through the Pregnancy and Women's Recovery Center at Magee. Mother had spent a week as an inpatient at Magee prior to N.M.'s birth, and she was continuing treatment on an outpatient basis. Caseworker Schilken testified that after she was assigned this case, she reviewed the family's history with the Agency. ***Id.*** at 31. This "assessment" resulted in an informal safety plan, which was not documented. ***Id.*** at 34. ***See also*** N.T. Vol. 2 Dependency Hearing, 10/2/22, at 83 (CYS Administrator testifying Agency policy requires safety assessment be done within 72 hours of "first face-to-face contact[,]" and this was not done in this case).

On April 22, 2022, Caseworker Schilken spoke with Father regarding "his plan" to ensure children's safety. ***Id.*** Father stated that he would serve as "protective capacity" to supervise contact between children and Mother, be it at his mother's home, or Mother's home. ***Id.*** at 35. No questions were asked regarding Father's prior criminal or Agency history at this time, but Caseworker Schilken testified that she was aware of both his criminal history and his history with the Agency. ***See Id.*** ("Q: So you were aware that

---

[7] CAPS Notes are the Agency's method for electronically chronicling and archiving case activity.

[Father] had a criminal history that included violent offenses and drug-related offenses; correct? A: I was, yes.").[8] ***See also id.*** at 43-44. When asked whether she felt that Father was able to serve in a "good protective capacity for the children," a newborn and a child just over one year old, Caseworker Schilken stated: "I don't make those decisions. I provided the information to my supervisor[, Amber Gauthier]." ***Id.*** at 36. She also testified that she spoke with both Supervisor Gauthier and Manager Barb Daubner regarding Father's criminal history and prior drug-related history with the Agency, ***id.*** at 42, but neither suggested that Father be drug tested. ***Id.*** at 43-44. ***See also*** N.T. Vol. 2, Dependency Hearing, 10/2/22, at 154 (Supervisor Gaulthier acknowledging her "assessment" or "allowing [Father] to serve [in] a protective capacity for [K.M. and N.M.] was based on information [she] received from [Caseworker Schilken a]nd there was no other investigation done by her or [M]anager [Daubner] to assess whether or not [Father] was really appropriate.").[9]

---

[8] Additionally, Father has a lengthy criminal history, which includes statutory sexual assault (F2); robbery ( F2); driving under the influence: highest tier (M); possession of a controlled substance (M); simple assault (M2); and escape (M2). The court took judicial notice of Father's criminal history. ***See*** N.T. Adjudicatory Hearing, 9/26/22, at 37-41.

[9] It was later determined that Supervisor Gaulthier was relying on Caseworker Schilken's extensive experience as a caseworker, and Caseworker Schilken was unaware that Supervisor Gaulthier was not state certified as a supervisor during the pendency of the case but, instead, was in the process of obtaining certification. Manager Daubner was also unaware that Supervisor Gaulthier lacked certification as a casework supervisor. ***Id.*** at 228-29.
*(Footnote Continued Next Page)*

- 11 -

On May 5, 2022, the Agency received a referral that both Mother and Father appeared to be under the influence at Mother's Magee appointment, and that one of the children was with them. *Id.* at 44. On May 6, 2022, Caseworker Schilken was able to make contact with parents. She attempted to drug test Mother, but Mother was unable to produce a sample; Father produced a urine sample, which was negative. However, in light of the Agency policy that precluded a member of the opposite sex from administering the test, it was also unobserved. *Id.* at 49-50.

On May 11, 2022, the Agency made a referral to Pressley Ridge Crisis Stabilization and Family Preservation Services.[10] *Id.* 52. In that referral, Caseworker Schilken stated that Mother had tested positive for fentanyl on April 28, 2022, and that "[M]other had previously admitted [Father], who is the other primary caregiver of the children, is actively using illicitly. Mother confirmed again at this appointment on 5/5 that her partner is in active use." *Id.* at 54. Both Caseworker Schilken and Supervisor Gaulthier testified that Crisis Services is the highest level of services provided by the Agency, and services are "five days a week for a least 10 hours." *Id.* at 62; N.T. Vol 2, Dependency Hearing, 10/2/22, at 77-78. Subsequently it was revealed that

_____

[10] The Pressley Ridge Crisis Stabilization and Family Preservation program works with parents who have an open case with the state and are in danger of losing their children to foster care. https://www.pressleyridge.org/services/community-based-mental-health-services/crisis-support (last visited 9/15/23).

these services were not in the home the requisite number of hours "because the family did not cooperate." *Id.* at 79.

On May 16, 2022, Supervisor Gaulthier made several CAPS entries regarding transferring the case to the ongoing services unit; however, the transfer was never addressed until June of 2022, and never effectuated.

On June 2, 2022, Caseworker Schilken made an unannounced home visit to drug test Mother.[11] *Id.* at 63. When they went into the bathroom, the toilet was clogged and filled to the brim with waste, so Mother had to use the edge of the bathtub to provide the sample. *See* Contact Summary, 6/2/22. Mother tested positive for fentanyl, and negative for the buprenorphine that she had been prescribed. *Id.* A rapid response Family Group Decision-Making (FGDM)[12] meeting was scheduled for the next day. *See* CYS Referral Form, 6/2/22 (stating purpose of meeting was to establish environment "that is safe and free from illicit drugs and that meets the children's needs consistently"). Notably, Father was not drug tested. *See* N.T. Adjudication Hearing, *supra* at 63.

The FGDM meeting took place on June 3, 2022. Caseworker Schilken testified that she was present for this meeting and acknowledged that,

---

[11] Caseworker Schilken also conducted unannounced home visits on May 5, May 6, June 7, June 27, and July 27 of 2022.

[12] FGDM is the preferred practice in Pennsylvania, which "allows the family to participate in the decision-making process along with the child welfare agency, service providers[,] and other interested persons." Benchbook, *supra* at 6-2.

although the purpose of the crisis or rapid-response meeting is to come up with a family plan, none was made. *Id.* at 64. The meeting was cut short because Mother went to an appointment at Crossroads Treatment Center for Suboxone treatment. *Id.* at 65. A report from the FGDM meeting indicated a follow-up meeting would be held, but that meeting never happened. *Id.*

Caseworker Schilken also explained that a family service plan is created after an intake case is accepted by the ongoing services unit. *See id.* at 61 (Caseworker Schilken testifying, "We make referrals for services a lot of times in intake to try to get the family to a position where they don't need to have an open, ongoing case."). Specifically, Caseworker Schilken testified:

> Q: And yet here we are, over two months [after opening the case due to Mother's drug use], and we're still having the same issue[.] But adding the additional layer of the delinquency notices, utility shutoff notices in the home, and a father who—by your own words—didn't really seem to grasp what was happening[.] And yet, there was never any discussion with your supervisor about, "Hey, we really need to get this case in court, ASAP. Things are not looking good"?
>
> A: No, there wasn't a discussion of court.
>
> Q: But you would agree with me that during the period from May 16, when I first asked you about transferring a case, even to the present, there was running dictation from your supervisor about transferring the case? Were you aware of that?
>
> A: Yes. Yes.
>
> Q: Do you know what the delay was in transferring this case?
>
> A: Yes. There was another case that I had that was—these two were very time intensive.

Q: Okay. Did you ask for assistance?

A: No.

Q: Why not?

A: I don't ask for assistance.

*Id.* at 68-69. *See also id.* at 69 (Caseworker Schilken testifying, "We tried to have a follow-up [after Mother's post-rehab fentanyl-positive test] and Father wasn't cooperative.").

On June 9, 2022, Supervisor Gaulthier documented an entry regarding transfer of the case to the ongoing services unit due to Mother's noncompliance. *Id.* at 1064. The following day, Crisis Services told Caseworker Schilken that the plan was for Mother to go to inpatient treatment in Greensburg, but she could not go at that time due to a lice infestation in the home. *Id.* at 1065.

On June 16, 2022, Mother entered inpatient rehab, but she left against medical advice on June 29, 2022. *Id.* at 57, 65-66. That same day, Caseworker Schilken drug tested Mother, just after she had left rehab, and Mother tested positive for fentanyl. *Id.* at 66. Additionally, it was learned that the parents had shutoff notices for water, electric, sewage, along with approximately $4,000.00 in delinquent property tax notices. Despite all of

these events, no immediate action was taken by the Agency, yet Supervisor Gaulthier continued to make CAPS entries about transferring the case.[13]

On June 29, 2022, the Agency made another referral for in-home services. *See* CYS In-Home Provider Referral Form, 6/29/22. Notably, the form indicated that no current safety plan was in place. *Id.* This was neither a crisis (24-hour response) nor rapid response (72 hours) meeting referral, both of which would have been options under the newly-established Family Engagement Initiative (FEI) in Washington County.

Appointments for Family Behavioral Therapy (FBT), scheduled for August 5, August 6, August 9, and August 11, 2022, were cancelled. *See* N.T. Adjudication Hearing, *supra* at 72-74.

---

[13] In the GAL's Memorandum, she states:

> According to its own policy and procedure, when a case is designated as one to transfer, the supervisor of that transferring unit must complete a "Case Transfer Request Form" that lists several tasks for the caseworker to complete. It is unknown if that form was ever completed. What is known is that between May 16, 2022 and August 10, 2022, [Supervisor] Gaulthier made eight entries in CAPS where case transfer was mentioned. While there was never a clear reason given for the delay, [Caseworker] Schilken and [Supervisor] Gauthier testified that they were working on other cases. It is interesting to note that the transfer summary was started on August 10, 2022, just one day before N.M.'s death, and supplemented with additional information pertaining to both children later. Had this case been transferred to the ongoing unit in a timely manner, it could have been assessed for potential court intervention. That did not occur, and as a result, one child died and the other was found to have dangerous substances in his system.

Memorandum of Law in Support of a Finding of No Reasonable Efforts, filed on Behalf of K.M. by GAL, Christina A. DeMarco-Breedan, Esquire, 10/26/22, at 19-20.

On August 11, 2022, the Agency received a report that Canonsburg Boro Police Officers were called to the family's home due to an unresponsive three-month-old infant. The family was transported to the hospital, where the infant was pronounced deceased. The Agency arrived at the hospital, but Mother, Father, and K.M. had already been released. The Agency, seeking to assess the safety and well-being of K.M., located the family at paternal grandparents' home and requested Mother and Father to submit to drug screens. They refused. K.M. was placed in kinship care with a paternal great aunt and uncle, who had been previously assessed by the Agency. *See* Amended Order of Adjudication and Disposition, 1/27/23.

On August 12, 2022, the Agency was notified that K.M.'s urinalysis "tested positive for cocaine metabolite and fentanyl," and that exposure was "within the past few days." *Id.*, citing Agency Exhibit 3 (UPMC Children's Hospital of Pittsburgh Emergency Department Evaluation, 8/11/22 & 8/12/22); Agency Exhibit 4 (Outpatient Evaluation, 8/12/22); and Agency Exhibit 5 (Photographs of K.M.). K.M. had superficial abrasions on his left foot, right chest, and left neck. K.M. was admitted to Children's Hospital for observation and discharged that same day. *Id.* At a shelter care hearing later that day, which neither Mother nor Father attended, the hearing officer ordered K.M. remain in the legal custody of the Agency and in the physical

custody of his kinship caregivers.[14]   The Agency ultimately filed a dependency petition on behalf of K.M. on August 15, 2022, four days after N.M.'s tragic and untimely death.

To summarize, the Agency took the following measures prior to K.M.'s removal:

- April 25, 2022:  Referral for Mother for drug and alcohol evaluation; Mother complied, was recommended for outpatient treatment, and was working with Crossroads Treatment Center.

- May 11, 2022:  Referral for in-home provider—Pressley Ridge Crisis Stabilization was with family from May 16, 2022 until June 16, 2022, when Mother entered inpatient rehabilitation.

- June 2, 2022:  FGDM referral initiated, and on June 3, 2022, Crisis/Rapid Response Meeting Held.  FGDM ended early as Mother was able to obtain same-day appointment with Crossroads.

- June 2, 2022: Washington County Drug and Alcohol Commission referral for a second drug and alcohol evaluation for Mother; Mother complied and was recommended inpatient treatment and entered inpatient treatment on June 16, 2022.

- June 29, 2022:  After Mother left inpatient care against medical advice, a second in-home provider referral was submitted for Pressley Ridge Crisis Stabilization. Blueprints[15] was also assisting the family.

---

[14] Mother and Father absconded, and were eventually found, arrested, and charged with criminal homicide.

[15]  Blueprints is a non-profit organization that serves residents in Greene County, Washington County, and West Virginia.  "Our 50 programs act[] as [a] catalyst to mobilize the resources of the entire community, enabling
*(Footnote Continued Next Page)*

- July 21, 2022: In-home provider referral was made for Pressley Ridge Family Behavioral Therapy.

- Caseworker Jennifer Schilken made unannounced home visits on May 5, 2022, May 6, 2022, June 2, 2022, June 27, 2022, and July 27, 2022.

Findings of Fact, Amended Order of Adjudication and Disposition, *supra* at 4.

The court determined CYS failed to exercise reasonable efforts by:

- failing to conduct a proper safety and/or risk assessment with the parents of K.M.;

- failing to ascertain necessary and appropriate services to address and potentially rectify safety and risk factors within the home of K.M.;

- failing to follow-up to ensure parents complied with referred and recommended services;

- [failing] to ensure family received the benefit of [referral] services; family failure to cooperate should have immediately accelerated Agency action, up to and including court action.

- failing to follow Agency policies and procedures with respect to:

    - assessments of risk and safety, included stated policy for regular monitoring, review, and supervision for modification of responses and/or advancement for modified or varied action, i.e., modification of service recommendation, advancement of crisis and/or rapid response, referral to ongoing [services], court action and/or rapid response [] to encourage compliance;

    - supervision and direction of caseworkers and casework supervisors;

    - referral for ongoing services, including lack of formal family service plan;

---

families and individuals to attain the skills, knowledge, motivations, and opportunities to become self-sufficient." https://myblueprints.org/ (last visited 9/12/23).

- referral for court activity;

- overall case assessment   review, supervision, and management.

Order, 1/9/23.

As our Supreme Court explained in *In re D.C.D.*, 105 A.3d 662 (Pa. 2014), a finding of reasonable efforts is tied to eligibility for federal funding:

> [T]he federal government enacted [the Adoption and Safe Families Act] (ASFA) and related statutes to address the problems of foster care drift and ensure that dependent children are provided permanent homes either through reunification or adoption.  To accomplish this goal, the federal government tied federal funding of foster care and adoption assistance to each state's adoption of a plan regarding its foster care system.  [*See*] 42 U.S.C. § 671 (setting forth requirements of state plan "[i]n order for a State to be eligible for payments" for foster care and adoption assistance).  The federal government required state plans to provide that "reasonable efforts shall be made to preserve and reunify families," absent certain exceptions.  *Id.* [at] § 671(a)(15)(B).  Section 672 in turn provides, inter alia, that a state should "make foster care maintenance payments on behalf of each child" if "reasonable efforts of the type described in section 671(a)(15) of this title for a child have been made."  *Id*. § 672(a)(1), (2)(A)(ii). The federal payments to the states are likewise based upon the [s]ection 672 payments.  *Id.* [at] § 674; *see also* 45 C.F.R. 1356.21(b) (detailing that agencies must make reasonable efforts "to effect safe reunification" to be eligible to receive federal foster care maintenance payments).

*In re D.C.D.*, 105 A.3d at 667 (footnote omitted).  *See In re R.J.T.*, 9 A.3d 1179, 1186 (Pa. 2010) (observing revisions following 1997 federal enactment of ASFA were to address problem of foster care drift by allowing agencies to pursue concurrent planning to ensure children "move more quickly through the dependency system and into the permanent placement best suited to their

individual situation through simultaneous pursuit of reunification and alternative permanent placement").

As explained further in the Benchbook, a finding that an agency did not provide reasonable efforts to prevent placement "indicates that the evidence and testimony provided to the court supports a conclusion that there were things the agency could have reasonably done to prevent placement; however, for whatever reason those things were not done." Benchbook, *supra* at 6.1.1. *See also id.* ("However a child enters out-of-home placement, the judge is required to make findings regarding the **reasonable efforts made by the child welfare agency to prevent placement. This determination is directly linked to the safety threat which led to the child's placement and should be based upon the unique circumstances of each child and family**.") (emphasis added).[16] Here, an objective appraisal of the events in this case indicates that the level of effort extended over the life of this case was not reasonable. *See In Interest of S.A.D.*, 555 A.2d 123, 127 (Pa. Super. 1989). It is the responsibility of those working

_____

[16] At the hearing on the Agency's motion for reconsideration, the Agency argued that a reasonable efforts determination, pursuant to subsection 6351(b)(2) of the Juvenile Act, should not include a consideration of the Agency's risk assessment, or whether a risk assessment was conducted. *See* N.T. Hearing on Motion for Reconsideration, 1/27/23, at 24-26. Although the Agency abandoned its motion for reconsideration at the conclusion of the hearing, this argument is stunningly in conflict with the Agency's stated purpose: "To ensure completion of thorough, timely assessments to determine the current safety and potential risk of harm to children and a family's need for services." *See* Washington County Children and Youth Services Policy and Procedure, 2/6/13, at 1.

closely with the family to recognize when parental "lack of cooperation" translates to safety risks for the children. ***See C.K.***, ***supra*** at 943 (although agency cannot guarantee parents' success, it is clear agency's duty to make reasonable efforts is independent of parents' duty to accept such efforts). Whether due to lack of training, communication, supervision, or adherence to policies and procedures, the seriousness of the risks to both N.M. and K.M., at all levels, was not appreciated. As this Court has previously recognized:

> We are aware of the pressures and large workload placed upon child welfare agency caseworkers, many of whom work very hard to serve their assigned families. Nevertheless, it is crucial that child welfare agencies monitor their cases and follow up diligently to ensure that services are implemented in accordance with the families' needs[.] Simply making the referral is not enough.

***Id.*** at 945.

Finally, we note that Judge McDonald was in the best position to assess the Agency's explanations and determine credibility. ***See In re E.P.***, ***supra***; ***see also In re W.M.***, ***supra***. The court concluded that the Agency did not offer adequate explanations for the delays or miscommunications. ***See*** Order, 1/27/23. After reviewing the record, we cannot determine that this conclusion was manifestly unreasonable. ***See In re J.R.***, 875 A.2d 1111, 1114 (Pa. Super. 2005).

In closing, we note the summation of this tragic case offered by the GAL in her memorandum to the trial court:

> There is not one person who mishandled this case; rather, it was the Agency as a whole. The Agency is tasked with trying to keep troubled families intact by offering assistance, and when that is

not possible, it must protect the children. That did not happen in this case. . . . The Agency is in a crisis of the highest magnitude with the most severe side[-]effect being the unthinkable end of a 3-month-old child's life and what could have easily been the end of a 16-month-old child's life. There is no doubt N.M's death was preventable, and while the parents should not be absolved for their role it in it, neither should the Agency. The Agency had a legal duty to act in the best interests of N.M. and K.M. and failed them at every turn. Consequences are more than warranted for this type of egregious conduct by a government agency in the form of a finding of lack of reasonable efforts. While monetary sanctions cannot change what happened to N.M. and K.M., it would send a direct message to the Agency that[,] in order to prevent future tragedies in the form of innocent children losing their lives and/or being exposed to deadly substances, drastic and swift change must occur. This continuous culture of plausible deniability must cease. Children are our most valuable yet equally vulnerable resource, and when parents fail to protect them, the Agency is required to intervene and act in accordance with the law. It failed miserably here.

Memorandum in Support of a Finding of No Reasonable Efforts, filed on Behalf of K.M. by GAL, Christina A. DeMarco-Breedan, Esquire, 10/26/22, at 22, 26-27.

We find no abuse of discretion, **In re E.P.**, **supra**, and we rely on Judge

McDonald's comprehensive opinion[17] to affirm her order finding lack of

---

[17] The Benchbook also provides, as a "best practice" point, the following:

Because reasonable effort findings have such a significant impact on the financial resources available to assist children and their families, courts are encouraged to communicate clear expectations to the agency. When possible, courts should ask questions to elicit the information needed to satisfy its belief that reasonable efforts have been provided. Courts are further encouraged to articulate their rationale when a finding of no reasonable efforts is made so as to inform the agency of the systemic changes needed.

*(Footnote Continued Next Page)*

reasonable efforts. The parties are directed to attach a copy of that opinion in the event of further proceedings.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Filed: 10/26/2023

---

Benchbook, *supra* at 20.3 (emphasis added). Judge McDonald's opinion has more than met this "best practice" point.

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

JUVENILE COURT DIVISION

| | | |
|---|---|---|
| IN THE INTEREST OF: | ) | |
| | ) | |
| K.M. | ) | Docket No.: DP 64-2022 |
| | ) | |
| D.O.B.: 10/ .2020 | ) | |
| A Minor Child. | ) | |
| | ) | |

## RULE 1925 OPINION

In foreword, this Court believes it is important to include a brief statement regarding the opinion contained herein. Prior to the hearings detailed, this Court did not understand the insistence of the Guardian Ad Litem ("GAL") and parents' attorneys that there should be a finding of lack of reasonable efforts on behalf of the Agency. Through voluminous testimony and exhibits, however, the failure of the Agency to put forth reasonable efforts became undeniable. The Agency continually highlighted the efforts that were implemented and has argued that those efforts constitute reasonable efforts. However, this case highlights a clear breakdown in the Agency actions and the failures of multiple actors to engage, follow-up and respond. The Agency did not follow their own policies, failed to adequately assess the family needs, took "empty" actions, and failed to follow-up and alter response with the actions. The Agency failure permitted the circumstances in the home to fester and deteriorate, culminating in the death of the minor child's infant sibling and likely forever denying K.M. the opportunity to be in the care of his parents.

### I. Statement of Present Matter

Before the Court is a Notice of Appeal and a Concise Statement of Errors Complained of on Appeal in reference to the above-captioned case at Trial Court Docket Number DP 64-2022.

Appendix B

Following an adjudication hearing, wherein the issue of reasonable efforts was bifurcated, two (2) additional hearings, review of voluminous exhibits entered by the parties, (including internal Agency CAPS notes) and findings of fact and conclusions of law submitted on behalf of all parties, this Court issued a decision finding that the Agency had failed to exercise reasonable efforts, pursuant to 42 Pa. C.S.A. §6351(b). Prior to making the finding on the issue of reasonable efforts, this Court carefully and meticulously reviewed and re-reviewed the submitted evidence and testimony. To assist the appellate court's review, this statement will provide detailed insight into this Court's analysis. In delivering the opinion, this Court adopted the recitation of case history and argument advanced by the GAL in her Findings of Fact and Conclusions of Law and further provided specific findings of lack of reasonable efforts with opportunity for the Agency to address the deficiencies outlined.[1]

This Court's finding of lack of Agency reasonable efforts to prevent removal of K.M. from the home was issued in excess of sixty (60) days from the stipulated adjudication date,

---

[1] See attached trial court opinion stating, "After countless reviews of the above-noted materials, this Court adopts, in full, the recitation of case history and argument advanced by the Guardian Ad Litem (GAL) on behalf of Minor Child K.M.. In the GAL's comprehensive and extensively written memorandum, the GAL outlines a logical, convincing and compelling argument that this Court finds fully supported by the testimony, evidence, and record. . . . . While the liability and accountability of the parent actions cannot be dismissed, the monumental failures of the Agency demand a finding of no reasonable efforts. More specifically, this Court finds that CYS failed to exercise reasonable efforts by:
- Failing to conduct a proper safety and/or risk assessment with the parents of K.M.
- Failing to ascertain necessary and appropriate services to address and potentially rectify safety and risk factors within the home of K.M.
- Failing to follow-up to ensure parents complied with referred and recommended services.
  - Referral to the outside agencies did not relieve the Agency of the obligation to ensure the family received the benefit of such services. Family failure to cooperate should have immediately accelerated actions of the Agency, up to and including Court Action.
- Failing to follow Agency policies and procedures with respect to:
  - Assessments of Risk and Safety, including stated policy for regular monitoring, review, and supervision for modification of response and/or advancement for modified or varied action. i.e. modification of service recommendations, advancement of crisis and/or rapid response, referral to ongoing, court action to encourage compliance.
  - Supervision and direction of Caseworkers and Casework Supervisors.
  - Referral for Ongoing Services, including lack of formal family service plan.
  - Referral for Court Activity.
  - Overall Case assessment, review, supervision and management.

however such action was undertaken at the request and consent of all parties to provide for an opportunity for additional discovery and testimony. In the initial adjudication order of September 26, 2022, this Court specifically indicates that the scheduling of the next hearing is for purposes of receiving testimony and evidence on reasonable efforts. *See September 26, 2022, Volume I Transcript of Adjudication hearing at Pages 154-156.*

While this Court argues that its Opinion and Order finding no reasonable efforts provides detailed and sufficient reason in support of the Order, this Court is also cognizant that this issue and the resulting decision is unique and therefore supplements such opinion herein. *See attached Trial Court Order and Opinion.* See also: *Pa Rules of Appellate Procedure, Rule 1925(a)(1).* Preliminarily, this Court again adopts the findings of fact asserted by the GAL, and incorporates the same as part of this 1925 opinion. *See Memorandum of Law in Support of a Finding of No Reasonable Efforts by Guardian Ad Litem, Attached hereto and made a part herein.*

II.    Standard of Review

The standard of review in a dependency matter is abuse of discretion. Appellate Courts instruct that they, "must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determinations as opposed to its findings of fact, and must order whatever right and justice dictate. We review for an abuse of discretion...[W]e accord great weight to the [trial] court's fact-finding function because the [trial] court is in the best position to observe and rule on the credibility of the parties and witnesses." *In re C.K. 165 A.3d 935, 940-41 (Pa. Super. 2017), quoting In Re W.M., 41 A.3d 618, 622 (Pa. Super. 2012) (citations omitted).* Accordingly, the appellate court is tasked with evaluating this Court's inferences, deductions, and conclusions and

their application of the law in evaluating whether there is an abuse of discretion. This Court respectfully argues that a full review of the record establishes no abuse of discretion.

## III. No Abuse of Discretion Should be Found with the Timing of the Court's Finding that the Agency Failed to Exercise Reasonable Efforts to Prevent Removal

As its first issue on appeal, the Agency argues that this Court erred as a matter of law and/or abused its discretion in failing to issue a final order with regard to reasonable efforts to prevent or eliminate the need for removal of the minor child K.M., "within thirty (60) [sic] days from the adjudication of dependency." This Court acknowledges that the opinion issued finding no reasonable efforts was provided in excess of thirty (30), sixty (60) and even ninety (90) days following the stipulated adjudication of dependency. Nevertheless, any claim that such finding was in error has been waived by the Agency. As noted in the September 26, 2022 Adjudication Order:

> [T]he Court defers finding on Reasonable Efforts inasmuch as parent counsel and GAL are requesting additional hearing time to introduce further testimony and evidence for this Court's consideration as to whether allowing the child to remain in the home would be contrary to the child's welfare, and that Preventive services were not offered due to the necessity for emergency placement. Following additional testimony and evidence, should this Court determine that preventative services were not provided and/or were not appropriately provided, this Court shall determine if the lack of services was reasonable under the circumstances and whether the level of effort was reasonable due to the emergency nature of the situation, safety considerations, and circumstances of the family. Such determination shall be made through amended order.

*See Permanency Review Order of September 26, 2022.* Through the same order, this Court indicated that an additional hearing would be conducted for the specific purpose of receiving additional testimony and evidence on Reasonable Efforts. *Id.* See: *Adjudication Hearing Transcript, Volume I, Pages 154-155 (hereinafter "Hearing Transcript" in reference to all volumes).* **The Agency failed to object or preserve the issue of timing of the decision. In**

fact, the Agency requested an additional hearing date for receipt of further testimony, which was commenced on October 19, 2022.[2] All parties then requested the opportunity to brief findings of fact and conclusions of law. Following the issuing of the opinion, the Agency filed a Motion for Reconsideration, arguing multiple points of error which will be throughout this statement in further detail.[3] The Agency failed to assert timeliness of the opinion in the Motion for Reconsideration. During the hearing on the Motion for Reconsideration, the Agency withdrew and waived all claims asking the Court to cancel the hearing scheduled the following week to permit the Agency to establish rectified efforts and demanded this Court enter a final order finding no reasonable efforts to prevent removal. At each opportunity, the Agency failed to argue timing of this Court's decision and consented to the bifurcated finding.[4]

For each of the aforementioned reasons, any argument regarding the timeliness of the finding that the Agency lacked reasonable efforts to prevent removal have been waived.

---

[2] *See Hearing Transcript, Volume 2, Page 270.*

[3] While the Motion for Reconsideration was ultimately withdrawn, the Agency did not request the Motion be stricken from the docket. This Court refers to the Motion because several references in the Motion, which was filed without a fully signed affidavit, refer to items unsupported by the record, that were never entered into case testimony and/or evidence. This practice prevents opposing counsel from having the opportunity to cross-examine and/or challenge the information. Nevertheless, this Court recognized that the two (2) Agency solicitors who handled the case through the series of hearings, the Deputy Director and Casework Manager are no longer with the Agency and also were not there at the time the Motion for Reconsideration was drafted. Accordingly, this Court excused the wholly unsupported averments and introduction of argument never previously introduced.

One such statement indicates that, "Pennsylvania is a State Supervised, County Administered Child Welfare System. The Court does not have the authority nor the expertise to conduct quality assurance or compliance reviews. Pennsylvania Office of Children and Youth and Families, Western Region conducted a thorough review of the case of K.M. and did not make the same finding as this court." This averment is particularly troublesome because the evidence presented to the Western Region Agency is unknown to this Court and/or any of it's participants and likewise, Western Region has no knowledge of what testimony and evidence was presented in this court. The averment suggests that Western Region decision demand precedence over this Court's holdings and suggests that the Court has no authority to evaluate actions of the Agency. Finally, the averment is inconsistent with the testimony of Director Schlegel during the hearings wherein she testified that the State was issuing citations against the Agency as a result of factors related directly to this case. *See Hearing Transcript, Vol. 2, pgs. 75-59.*

[4] It should be noted that the Court's delay in decision had no impact regarding the permanency of the Minor Child. As will be discussed herein, all parties stipulated to the Adjudication of the Minor Child and the placement recommendation of the Agency.

IV.     The Agency Failed to Exercise Reasonable Efforts to Prevent or Eliminate the Need for Removal of the Minor Child

In the second, very broad allegation of error and/or abuse, the Agency argues that this Court's conclusion that the Agency did not exercise reasonable efforts to prevent or eliminate the need for removal of minor child, K.M., from the home was in error. This issue was also effectively waived by the Agency, given consideration of the Agency's request and subsequent withdraw of its motion for reconsideration, refusal for review hearing to cure[5], and demand for final order. However, due to the unique legal issue presented, this Court will address the broad allegation.[6]

Introductory Comments Regarding Court Evaluation on Reasonable Efforts

This Court is provided with little guidance in review of the issue of reasonable efforts at the time of adjudication. The lack of guidance provides some insight into the Agency broad position. The appellate courts have cited the Dependency Benchbook in analyzing the issue of

---

[5] In the Withdrawn Motion for Reconsideration, the Agency requested that this Court reconsider, "the Court's directives to the Agency regarding employee training, oversight, policy development and implementation." As will be illustrated in this statement, the Court utilized these Agency policies in defining reasonable of the Agency actions. Further, in issuing the finding on reasonable efforts, this Court was attempting to give the Agency an opportunity to cure the lack of reasonable efforts, given the circumstances and history of the case.

[6] See Transcript of Proceedings in hearing on Agency Motion for Reconsideration of January 27, 2023. Newsome-Boyles, Agency Solicitor indicates: "I do think that we have—everybody's put on their position and you had asked us earlier if you want us to forego the opportunity to cure reasonable efforts, and we would prefer to forego the opportunity to cure the reasonable efforts for you to make a determination and to issue—or to include that it's a final and appealable order." *Id. at 72.* To confirm this decision, the Court indicated to Agency Direct, "Ms. Schlegel, because it is such a dramatic decision, you're waiving your right to cure reasonable efforts, I need you to state for purposes of the record that you are, in fact, waiving that right. Ms. Schlegel?" Schlegel deferred back to her Agency solicitor who then indicated, "Yes, Your Honor, it's the Agency's position that <u>we are requesting to forego the opportunity to cure reasonable efforts by providing documentation of policies or procedures</u> that **have been enacted after the date of the child coming into care** and ask the Court to make a determination as to reasonable efforts based upon the evidence that was presented at the prior hearings on this case and to indicate that it's a final and appealable order." *Id at 73.*

reasonable efforts. Additionally, most evaluations are done with respect to reasonable efforts following adjudication and not evaluating reasonable efforts in prevention of removal.

Oftentimes, it appears easy to simply evaluate circumstances as "emergent," excusing a child welfare agency of the need for reasonable efforts to prevent removal. And this Court concedes, in relation to an emergency shelter hearing, circumstances may require such a finding. However, at the time of adjudication and disposition and armed with additional information, a more careful examination is warranted.

In the present matter, considering, the drug related death of an infant child with incarcerated parents, the easy decision is to excuse lack of reasonable efforts as a result of emergency and/or to excuse lack of reasonable efforts because some effort was undertaken. While that may be the "easy" decision, this Court would argue that it is not necessarily the right decision.

As noted, this Court was initially perplexed at the requests of both parents and the GAL for stipulation as to adjudication while demanding a finding of lack of reasonable efforts. In complete candor, at the outset of the argument presented by parent counsel and the GAL, this Court was reticent to consider the possibility of lack of reasonable efforts. In addition to the initial reluctance, this Court considered the impact on pending criminal proceedings involving the parents; the discord the decision may have with the County's newly enlisted Family Engagement Initiative; and the proverbial slippery slope of placing the Agency in the untenable position of taking future actions prompted by a fear of a lack of reasonable efforts finding instead of acting in fashion prudent and appropriate to the specific factual information of each case.[7]

---

[7] Frankly, due to the unique and factually charged issues involved with this case, the Court was also concerned of creating bad law. Nevertheless, those same unique and factually charged issues are the very reason this Court's opinion was issued.

However, the testimony and evidence convinced this Court that, despite the appearance of the Agency taking steps to prevent the child from being removed from the home, there was a valid argument for establishing a lack of reasonable efforts to prevent removal. As guided by this Honorable Court in *In re C.K., 165 A.3d 935, 941-942 (Pa. Super. 2017)*, it is insufficient for the Court to find simply that an action will prevent removal, this Court must also determine whether the action constitutes a **reasonable effort** toward preventing removal of the Child from the home.

However, having no specific definition of reasonable efforts, this Court was forced to develop a standard for evaluating the undefined. As set forth in the decision of *In re C.K., 165 A.3d 935, 941-42 (Pa. Super. 2017)*:

> Neither federal nor Pennsylvania law defines "reasonable efforts." Notwithstanding the lack of a legal definition, we discern the following from prior cases. Because the <u>focus</u> of the Juvenile Act is on the <u>dependent child</u>, as opposed to parents, <u>any services for parents must directly promote the interests of the child</u>. By requiring only "reasonable efforts" to reunify a family, the statute recognizes that <u>there are practical limitations to such efforts</u>. <u>It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a reasonable effort toward reunification</u>. This Court has stressed that the agency is not expected to do the impossible and is not a guarantor of the success of the efforts to help parents assume their parental duties.

While this provides some guidance in evaluating reasonable efforts in general, it fails to consider the earlier assessment of reasonable efforts, considering whether reasonable efforts were made to prevent or eliminate the need for removal of the child from the home. *See 42 Pa. C.S.A. §6351(b)(2)*. Applying the rationale of C.K. in an assessment regarding reasonable efforts to prevent removal, this Court would be guided with the following language:

> Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the interests of the child. By requiring

only "reasonable efforts" to prevent removal of the child, the statute recognizes that there are practical limitations to such efforts. It is not sufficient for the court to find simply that an action will prevent removal; however, the court must also determine whether the action constitutes a reasonable effort to prevent removal without placing the Agency in the position of being a guarantor of success.[8]

Countless dictionaries associate reasonableness with common sense, fair and sensible acts, a degree of care, possessing sound judgment, moderate action. *See Black's law Dictionary, Merriam Webster Dictionary, Dictionary.com.* In a nutshell, reasonable efforts can be evaluated as taking appropriate and sensible actions, undertaking to exercise a reasonable degree of care without the high bar of a best effort evaluation.

So what makes an effort reasonable? Is it implementation of a safety plan, a referral for services and/or continuing to engage in the same level of effort and expecting a different result?

This Court came to the realization that many "efforts" purportedly taken by the Agency were "empty actions" that were designed to simply check a box, rather than implement appropriate services to prevent removal. Paired with an anemic assessment, much of the "action" touted as "reasonable" by the Agency involved "referrals" of which Agency representatives failed to understand and failed to establish as consistent with the needs of the family. The record further supports a finding that the Agency failed to perform adequate follow-up to determine if the services were actually implemented and/or appropriately addressed the primary concerns and the Agency never modified its response.[9] Finally, the evidence and

---

[8] In the Withdrawn Motion for Reconsideration, the Agency made argument regarding the In Re C.K. definition. The Agency argued that the inquiry is not whether a family followed the requests of the Agency, the inquiry is as whether or not the efforts were made by the Agency. In essence, the Agency argues that because efforts were taken, there cannot be a finding of lack of reasonable efforts. The key word here is reasonable.... Not successful efforts, not best efforts, but reasonable efforts. As will be further detailed herein, this Court found that the efforts undertaken by the Agency were NOT reasonable. Any evaluation of the success and/or failure of the family was done in effort to ascertain the reasonableness of the Agency response.

[9] Primary Concern being the safety of minor children in the home when at least one (1) and potentially both parents were suffering with illegal abuse of controlled substances. See Testimony of Director Schlegel, the main issues of

testimony clearly establish that the Agency failed to follow their own policies and procedures with regard to intake and assessment, referral for services, communication within the Agency, with providers, and with the family. In fact, the persons placed in charge of handling this case directly testified to:

- Lack of knowledge of Agency policies and procedures;
- Lack of awareness of provider services which were referred by the Agency;
- Lack of proper direction and Supervision; and
- Lack of knowledge and/or awareness of actions of other Agency employees, service providers and most importantly the family.

An additional layer considered was the impact of the glaring inconsistencies in the testimony, the Agency representative's inability to support the rationale behind actions and inactions, paired with incessant finger pointing and assignment of blame and responsibility.

Having come to this realization, the Court then considered three (3) important questions:

- What is the Standard of Reasonableness as it relates to the Agency actions;

- Can lack of Reasonable Actions equate to Lack of Reasonable Efforts; and

- Did the Agency Deny K.M. the opportunity to remain in the care of his parents by failing to exercise reasonable efforts to prevent his removal.

Follow review of the testimony, evidence, exhibits and records, this Court developed what it considered a fair evaluation of reasonableness, formed by the Agency's own standards, policies and procedures. Utilizing this standard of reasonableness, the second two (2) questions were answered with a resounding yes. What follows is an exploration into this Court's findings.

---

the case include: drug and alcohol use by Mother; lack of cooperation; and the history of birth Father. *See Hearing Transcript, Vol. 2, pg. 99-100.*

## V.    Defining the Standard of Reasonableness as It Relates to Agency Actions

Using the definition and roadmap above, this Court sought to review the testimony and evidence without holding the Agency to the level of near to absolute success. Rather, this Court evaluated the evidence to ascertain if the actions of the Agency made logical sense. Therefore, to assess the question of the standard of reasonableness as it relates to the Agency actions, this Court looked at Agency standard policies and procedures to establish a baseline. [10]

### Lack of Reasonable Actions

This Court made a specific finding that, in the present matter, the Agency failed to perform a proper safety/risk assessment of the family. This finding was based on direct statements of Agency representatives that required assessments, protocols and procedures were not completed. The Agency has a defined hierarchy that provides for oversight and review in making safety and risk evaluations, along with case review for response and potential services.[11] In the present matter, there was a complete failure of all of these systems.

---

[10] In its later withdrawn Motion for Reconsideration, the Agency, in large part, argues that this Court was wrong and overstepped its authority in delivering the decision finding lack of reasonable efforts. More specifically, the Agency argued that this Court failed to take in account the actions taken by the Agency and considered the overall system of Washington County Children and Youth Social Services (CYS) as opposed to a specific focus on the facts in the present case. To the contrary, this Court has been laser focused on the facts of this specific case. However, it would be impossible to make a reasonableness to prevent removal evaluation under 42 Pa. C.S.A. §6351(b) without review of Agency policy. The analysis is not done with a "better mousetrap," "Monday morning quarterback," or quality control mentality. Rather, this Court made its decision of reasonableness based on the policy, procedure, evaluations, omissions and inconsistencies that representatives of Washington County CYS provided as the standard.

[11] In reference to the Dependency Benchbook, in the withdrawn Motion for Reconsideration, the Agency argues the following: "The parties stipulated to a long line of services that were offered to the family. The Court's inquiry must focus on the services provided to assist the family. As the Pennsylvania Dependency Benchbook boldly emphasizes, 'to make this finding, evidence as to the agency's affirmative actions to make reasonable efforts is the sole issue' the Court's decision should refrain from analysis of agency staffing shortages, caseload sizes, or other systemic issues." This Court argues that the Agency reliance on this argument is a misunderstanding of the Benchbook. The complete statement in the Benchbook is:

> Every hearing that requires that a reasonable efforts finding requires evidence about the "reasonable" actions of the agency to assist the child and parents. It is not sufficient to

Additionally, while the Agency made "referrals" for family services, it became apparent that many of the referrals were simply "empty actions." The record establishes that, the referrals failed to result in any actual and meaningful services for the family and the Agency representatives failed to exercise effective follow-up to be alerted to these problems. In fact, testimony is clear that many of the services by which the Agency made a referral failed to be implemented or completed as referred. Evidence suggests that the family was unclear on what the Agency was requiring and Agency employees were unclear on the parameters of the services they referred.

Finally, contrary to the policy described by all witnesses, the Agency failed to take actions to modify their response to the lack of cooperation of parents, the unsuccessful referral of services and the continued drug abuse issues within the home. Most apparently, the Agency failed to prepare the Case for transfer and/or modify responses consistent with the specific dynamics of the family.

---

simply hear the evidence as to compliance and progress level of the parent or child. Nor should the court include in its analysis agency staffing shortages, caseload sizes or other systemic issues." *Benchbook at 20-5*

In context, it is clear that the Benchbook is stating that the systemic issues should not be considered as a justification for lack of reasonable efforts by the Agency. Rather, the Court should make a determination based on the subjective needs of the family and whether the efforts undertaken by the Agency were reasonable to address the needs.

The Agency continued the argument, later stating, "A finding of no reasonable efforts to prevent or eliminate placement partially or wholly upon analysis on system issues is improper and should be reconsidered. Further, this Court oversees less than 10% of the families that are brought to the attention of Washington County CYS and has no evidence of 'systemic' deficiencies. This court is overreaching its authority as a judicial branch, which does not have the authority to oversee the executive administrative branch, in this case, the county child welfare agency.

Again, as noted above, this Court was required to evaluate system failure in the present case because, as opposed to speaking to the reasonable services provided for the family, the Agency relied upon Agency policies generally to justify the actions taken in the case. Accordingly, to develop a fair evaluation of the reasonableness of actions in the present matter, this Court was required to evaluate those same policies. With regard to the Agency argument regarding its equal footing with the Courts as an Executive Administrative Branch, this Court will leave to the Honorable Appellate Court the determination of whether administrative agencies are exempt from judicial evaluation and the slippery slope implicated by this argument.

<u>Hierarchy of Agency</u>

To provide a basic overview of the standard operating procedures of Washington County Children and Youth Social Services (CYS and/or Agency), this Court was required to piece together testimony and evidence to develop the baseline of standard operations. Agency director, Anne Schlegel, confirmed through testimony, that the Agency policies and procedures are essentially an adoption of statewide statutory, regulatory and administrative mandates. Schlegel indicated that she is "in the process of updating Agency policy to become more consistent with current laws and to provide more consistency to Agency decisions. *See Hearing Transcript, Vol. 2, pgs. 8-15.*

Through the day-to-day operations of the Agency, responsibilities, oversight and supervision are designed in a multi-layered hierarchy. At the intake level, there are initial screeners and intake caseworkers. The intake caseworkers have case supervisors and the case supervisors have casework managers. The Agency casework managers report directly to the deputy director, who in turn reports to Director Schlegel.[12]

In accordance with this hierarchy, in the present case, the intake Caseworker, Jennifer Schilken testified that she is not permitted to make independent decisions and would only follow the direction of her Supervisor, Amber Gauthier, as it relates to assessments, actions and recommendations. Casework Supervisor, Amber Gauthier, testified that she relied on the decisions and information provided by Schilken, her intake Caseworker, and direction provided by Casework Manager, Barb Daubner. Former Casework Manager, Barb Daubner indicates that she had little information on this case and was not notified of any concerns from her Casework

---

[12] This hierarchy was developed prior to the tenure of Schlegel, but remains in use, along with the policies and procedures adopted prior to her tenure.

Supervisor, Ms. Gauthier, with whom she was entrusting the oversight and management of the case.[13] The Agency Director, Schlegel and former Deputy Director Angela Filotei indicate that the Agency policies and procedures dictate that the intake Caseworker was supervised and directed by the Casework Supervisor, Gauthier. Further, in this case, because Casework Supervisor Gauthier was uncertified, her actions should be managed and reviewed by her Casework Manager, Ms. Daubner.[14] However, when asked if she received reports of Ms. Daubner's supervision during the time frame between April 2022 through August 2022, Director Schlegel responded, "I did not receive any written reports, no." *Hearing Transcript, Vol. 2 at page 22.* Ms. Schlegel continued that **Ms. Daubner was required to document her**

---

[13] Amber Gauthier was, at all time in the case, "still in the process of participating in her foundations training as a supervisor." *Hearing Transcript, Vol. 2, pg. 19.* Schlegel indicated that Gauthier was hired in March of 2022 and was acting under the direct supervision of Agency case manager, Barb Daubner. *Id. at 19-21.*

[14] When asked what this involved, Schlegel testified that, "the responsibility would be that Ms. Daubner would meet with Ms. Gauthier on a regular basis, that Ms. Daubner would be present for all of the supervisions between Ms. Gauthier and her direct service caseworker, that Ms. Daubner would be working through the policies, procedures, safety risk, regulation, requirements, training requirements on the cases that Ms. Gauthier is overseeing as a teaching method. *See Hearing Transcript, Vol. 2, pg. 21.* However, this testimony was in direct contradiction to the testimony offered by Caseworker Schilken. *See Hearing Transcript, Vol. 1, page 92,-93* wherein the following exchange is documented:

Q. Did you have any conversations with Barb Daubner regarding the services offered in this case—
A. No.
Q. Prior to August 11?
A. No.
Q. Okay. Did you have any conversations with Barb Daubner regarding decision-making prior to August 11?
A. No.
Q. Okay. And the supervisor that directed you at this time period, between the time of April 22nd and August 11th, was that Amber Gauthier?
A. Yes.
............
Q. Would it be fair to say that your actions would have been directed by Amber Gauthier?
A. Yes.

Ms. Gauthier also testified that Ms. Daubner never attended her supervision meetings with Caseworker Schilken. *See Hearing Transcript, Vol. 2, page 206.* Ironically, Manager Daubner denied knowledge that the Casework Supervisor was uncertified, requiring more oversight.

involvement with Gauthier, however, **Schlegel was unaware if that occurred.**[15] *Id.* Director

Schlegel eventually admitted that **Ms. Daubner did not review the case between April 2022**

**and August of 2022.** *See Hearing Transcript, Vol. 2, pg. 53.*

Failure to Conduct Proper Safety and/or Risk Assessment

As one of the initial foundations of this Court's finding of lack of reasonable efforts, this

Court found that the Agency failed to conduct a proper safety and/or risk assessment with the

parents of K.M.[16] Quite simply, without solid initial and continuing assessments, it is this

Court's opinion that the Agency would have no ability to properly evaluate a case for services or

appropriate next steps.[17] Here, Caseworker Schilken indicates that she did an initial, informal,

safety assessment of the Case. *Hearing Transcript, Vol. 2, Pgs. 220-22.* However, the safety

assessment failed to include case history and assessments of key persons, namely the Father.

---

[15] When asked if Ms. Schlegel had any direct conversation with Ms. Daubner regarding her supervision in the matter, Schlegel responded by asking, "Can I ask if I am at liberty to discuss human resources issues?" *See Hearing Transcript, Volume 2 at page 32.* After considerable argument regarding further testimony on human resource/personnel issues, this Court limited the questions and asked directly if the Agency took any actions with the employees involved as a result of the present matter, to which Ms. Schlegel answered, "yes, we have." *See Hearing Transcript, Vol. 2, page 34.*

[16] In yet another Motion for Reconsideration argument, the Agency argued that, "[T]he Determination of what a "proper" safety and/or risk assessment is made by the Department of Human Services, Office of Children, Youth and Families. The Court does not have the authority to conduct quality assurance evaluations on case records." In response, this Court argues that, pursuant to the authority of *42 Pa C.S.A. §6351 (b)*, this Court has authority to make a finding on reasonable efforts. There is no exemption placed on the Court's authority to evaluate relevant and permissible evidence in making this assessment. Accepting this Agency argument would be accepting the theory that CYS and the Department of Human Services, Office of Children, Youth and Families is beyond the reach of judicial review.

[17] Just as with a medical consultation, the professionals are required to triage to determine the appropriate next steps. In doing so, it is reasonable that they would investigate the complaint, obtain a history and develop a plan of action. The reasonable next step would be to treat the issue and/or refer to proper other professionals and follow up to determine the effectiveness of the treatment. If the treatment was ineffectual or the referral was unable to provide the service required, the situation would be re-evaluated for an alternate form of treatment. If the patient was unwilling or unable to cooperate, the reasonable next step may be to refer for counseling, to advance the matter to another level or to involve trusted persons or loved ones to support the cause.

When asked specifically about risk assessments, the Caseworker indicated that a risk assessment is done with the gathering of information and is done throughout the intake of the case. Caseworker Schilken indicated that a written version of the risk assessment is not completed until a case is transferred. Here, there is no evidence supporting the ongoing risk assessment, formal or otherwise and the uncontroverted evidence establishes that the Agency failed to follow its own internal policy regarding assessment, review and transfer. This was confirmed through the testimony of Agency Director, Anne Schlegel, who testified that <u>the risk assessment in this case was not completed because the family made an "informal safety plan"</u> *Hearing Transcript, Vol. 2, pgs. 45-46.*

Based on the testimony and evidence, this Court found the "informal family plan" faulty inasmuch as the initial assessment ignored or dismissed valuable information. The plan was adopted by the Agency and followed with little to no alteration. The record establishes, despite the recent history with family and allegations regarding Father, the Agency accepted the "family plan" without further question, putting Father in the supervisory capacity **without engaging in a safety assessment with Father.** In addition to the "family plan" the Agency Caseworker also made "referrals." As will be examined in more detail later, the referrals were also faulty.

In light of this, even though the "family plan" with "referrals" may have prevented removal, this Court found that it did not constitute a "reasonable action." As will be discussed later, the Agency policies and procedures provided mechanisms to assess the family and discuss and develop an appropriate response, including the ability to modify the response. Unfortunately, in the present matter, the Agency didn't utilize those mechanisms. i.e. supervision, team meeting and case transfer.

Ms. Schlegel identified the GPS Policy and Procedure and was led through the outlined requirements of the manual. More specifically, Schlegel indicated that, in the present case, home visits were conducted and an **"unofficial" assessment of safety and risk was conducted.** *Id.* When asked what "unofficial" meant, Schlegel stated, "the paperwork document for the risk and safety assessment or for the risk assessment, I should say, not the safety assessment. **The risk assessment was not completed."** *Id. at 45.* Testimony further revealed that **a risk assessment was not completed between April 2022 and August 2022.** Schlegel further acknowledged that **required risk assessments to monitor the safety of the child and ensure contacts are made was not completed in this case.** *Id. at 60-61.* Schlegel further admitted that **the Analysis and Risk Assessment for the Pa Model Risk Assessment form was not completed in this case.** *Id. at 63-64.*

Director Schlegel acknowledged that **in-home safety assessments were not conducted according to Agency policies and procedures.** *Hearing Transcript, Vol. 2, pgs. 81-82.* Further, as acknowledged by several of the witnesses, in the present matter, <u>State mandated and local Agency directed requirements were not followed.</u>

## Case Transfers and Risk Assessment

In addition to the deficiencies in assessment, Schlegel testified on the difference between general protective service (GPS) and child protective services (CPS) guidelines, indicating that a GPS investigation provides that an intake worker has **sixty (60) days to complete their investigation.** *Hearing Transcript, Vol. 2, page 40.* Testimony continued that:

> "by day 60 the caseworkers will determine, one, if the allegation was valid or invalid. That is for a GPS. And then they have to determine the service outcome which is to either accept a case for services or to close the case. So in order to accept the case for services, you have to have a least

one valid allegation. If the case is not finalized by day 60, it is automatically accepted for service for the caseworker to then have to work it as a direct service case."

*Id. at 42.*

Despite denying knowledge of specific Agency policies and procedures, Casework Supervisor Gauthier confirmed this testimony.[18] When questioned about case transfers, Gauthier indicated that, while it is handled on a case by case basis, she likes to have case transfers completed within the first sixty (60) days from when GPS report is received. *Hearing Transcript, Vol. 2, pg 146.*

Director Schlegel was asked about the training of Caseworkers, Casework Supervisors and Casework Mangers regarding the specific policies to determine if the workers had awareness of the requirements. Although she indicated that all policies in effect at the relevant time were in place prior to her tenure, Schlegel indicated that Agency policies and procedures are made available to employees and they learn through on-the-job and hands on training, in addition to the hierarchy of supervision. Nevertheless, Supervisor Gauthier testified that she never received specific policies and procedures required by the Agency upon her employment. *Hearing Transcript, Vol. 2, pgs. 144 and 148.*

Caseworker Schilken also indicated a lack of awareness of specific Agency policies and procedures. *Hearing Transcript, Vol. 1, pgs. 137-141.* What the record establishes is that, Schilken never completed a formal risk assessment, indicating that this would be done as she nears the end of her participation with a case. In other words, when she prepares to move a case

---

[18] Gauthier testified that she most recently began working at the Washington County CYS office on February 22, 2022, but was previously employed by the Agency as an ongoing supervisor from October 2017 through May of 2018. *See Hearing Transcript, Vol. 2, pg. 143.* Ms. Gauthier also worked with Greene County CYS from November 2011 through May of 2017 as an intake supervisor. *Id. at 147.*

from intake to closure or transfers the case to the ongoing case list or through other measures. Here, despite conversations from May until August about transferring the case, by her own admission, statements of her Supervisor and Casework Manager Daubner, **the case was not transferred.**[19] Later testimony indicated this was because the Caseworker hadn't "completed everything to get the case ready." Presumably, this would include the risk assessment. Everyone in the Case recognized that the Case should properly be transferred to the ongoing case list.

- Schilken knew this, indicating that transfer in sixty (60) days was best practice;

- Gauthier knew this, indicating that she ideally would transfer a case in sixty (60) days; and

- Director Schlegel acknowledged the time-frame and indicated that the standard would be if a Caseworker doesn't complete a risk assessment in the required time period to allow the case to be transferred, it is the supervisor's responsibility to ensure that it gets done.

*See Hearing Transcript, Vol. 2, pg. 65.*

The testimony and case history support the finding that the case was not assessed and/or transferred consistent with Agency policy and procedure and State statutory and regulatory

---

[19] The Case is littered with references to the transfer to the ongoing case list. By short example:
- "I mean, we talked about—throughout the case. When I would report what was going on, it was, you know, to put services in, to schedule this, or you know, like the family group or FBT. And, certainly, we talked about transferring. You know, we knew that the ultimate goal was going to be transfer the case." *See Hearing Transcript, Vol. 1, pg. 76.*
- By Agency CAPs note exhibit, it is noted on June 9, 2022, that Gauthier entered a note indicating that "F did test for C.W. last time. We still have concerns since the children are so young and "M" doesn't seem to take this seriously. We can open case. Next Steps, transfer case." *See Hearing Transcript, Vol. 2, pg. 166.* (two months later on August 9, 2022 the case remained un-transferred and the family remained non-compliant. Forty-eight hours later, K.M.'s sibling was found deceased in the home.)
- CAPs noted of June 14, 2022, indicating that a family-group follow-up is not being scheduled, "Mother is going to inpatient and the case is being transferred." *Id.*

authority. This Court found that the Agency's failure to follow standard policy and procedure was not reasonable.


The Agency Action--- "Referrals"

Further troubling are the "referrals" and follow-up response by the Agency. Through testimony and evidence, we know that while Mother would agree to participate with services, initiate services and comply with assessments, she failed to follow-up and remained non-compliant, while continuing to test positive for illicit substances, through the pendency of the pre-petition case. Additionally, Father, the parent with whom the Agency entrusted the safety of the children, failed to comprehend and/or refused to understand the expectations of the Agency and became uncooperative as the case proceeded. Father demanded to know the specific goals to close the case.

In her further review of the GPS Policy and Procedure manual, Schlegel was asked about services provided for the family. Schlegel testified that referrals were made for drug and alcohol assessments and programs and Pressley Ridge Crisis and FBT services. *Hearing Transcript, Vol. 1, pg. 47.* Testimony continued that a family group decision making referral was made and a meeting was commenced but cut short. *Id. at 48.* As a further layer of complexity, at some point in late June 2022, Father indicated a lack of knowledge regarding the requests of the Agency. When asked what happens when the family refuses services, as what occurred in the present case, Schlegel testified:

> ... the agency will sit with the family and explain the course of the service, the reason for service, two, it would benefit the family, at times they would bring the service provider with them to the home to help identify what the service is and how that service could benefit the family. They would talk with the family if there was another service that they would prefer over the one that we referred to. At the end if, ultimately, the parents or anyone refuses, ultimately refuses, we

would assess that refusal. We would assess the impact that that would have towards the risk or safety of that child.. . . . And then once it's determine that they, the parents, still refuse to participate with the service, then we would assess the—the agency would assess the risk and safety to that child given the fact that the family does not want to participate. And then we would have a decision-making meeting, a **team decision-making meeting,** to determine if there are other avenues or if court intervention would be necessary.

*Id. at 49-50.*

Director Schlegel defined a process where the Agency could address parents who failed to cooperate, indicated a lack of understanding and/or refused services. There is no evidence of the process being instituted in the present case. Additionally, both Schilken and Gauthier indicated that they didn't know who discussed Father's concerns with the family but expected that to happen from referral sources.

Schlegel then testified that, in the present case, despite parents failing to participate with recommended services, **there was no team meeting on this case prior to the infant death** in August of 2022. *Id. at 51.* Despite evidence and testimony that Schilken and Gauthier had both utilized the "team meeting" approach previously, they failed to request this mechanism and/or alternative known Agency responses. The Court found these actions unreasonable.


Service Referrals and Modification of Response

As referenced above, a finding of reasonable efforts does not require a finding that the Agency is successful in the efforts, the Court must simply determine if the actions are reasonable. Reviewing the record, parents were non-compliant, the areas of concern in the home continued to exist and even the Crisis services put in the home failed to be effective. Nevertheless, the Agency maintained the same course of action, without altering the plan or modifying the response, all while anticipating the eventual transfer.

Schlegel was directed in testimony to the Child Protective Services Law and asked about

*55 Pa Code 3490.73*, which indicates that:

> The county agency shall petition the court if one of the following applies:
>
> (1) Placement or continued placement of a child is necessary.
>
> (2) A subject of the report of suspected child abuse refuses to cooperate with the county agency in an investigation, and the county agency is unable to determine whether the child is at risk.
>
> (3) The parents refuse services, and the county agency determines that services are in the best interests of the child.

When asked about the validity and application of the provision, Schlegel testified, "If the parents

refuse services, yes. **In this case they were not refusing services, they were just not**

**cooperating.**"[20] *Id at 52.*

The Case was not referred for Court action and other than modifying the referral to

another Pressley Ridge program, that appears to be a step-down from an earlier referral, no

modification was made to the Agency response. This Court found these actions of the Agency

unreasonable.

Agency Direction and Supervision in Relation to Actions and/or Inactions

Caseworker Schilken testified that she failed to take several case related actions because

she was not directed by her supervisor to take such actions. During the hearing, Counsel

---

[20] A follow up question was asked regarding how the agency differentiated between noncooperation and refusal, to which Schlegel testified, "They are not saying that we are not going to participate in these services. They would answer the phone, be there sporadically, not engage to the extent that the agency or service provider would hope that they would The point for this is if the agency determines it is in the best interest of the child, so that goes back to what I had said before if a family does not engage with the services that are offered to them. Then the agency would need to assess what the safety or risk concern would be for that child. And if that concern was present then, yes, we would petition the Court for compliance. Here, there is no evidence the Agency performed any follow-up assessment of safety or risk and failed to petition the Court prior to the death of K.M.'s infant sibling.

appropriately questioned Ms. Gauthier regarding her direction of the Caseworker. The exchange was as follows:

> Q. Okay. And then, which brings me to my next question, Ms. Schilken had testified at a prior hearing that she essentially only did what was directed. And you are indicating today that you are relying on Ms. Schilken's experience. So who made decisions on this case?
>
> A. So she wouldn't bring everything to me for me to help her, but, I mean, I trust her judgment out in the field because she is such an experienced caseworker.
>
> Q. Did you make any independent decisions other than what Ms. Schilken brought to you?
>
> A. I made some service referrals.
>
> Q. Which service referrals did you indicate to her that would be appropriate?
>
> A. I believe it was stop.
>
> Q. Okay. **Were stop services implemented in the home?**
>
> A. **I know there was a referral.** I don't know if they were actually started. Then FBT came in.

*See Hearing Transcript, Vol. 2, Page 215.*

The lack of conformity with the Agency's own internal policies, most dramatically with regard to the review and oversight came through the testimony of Casework Supervisor, Barb Daubner. Because her testimony sheds light on the magnitude of the omissions, a detailed accounting of her testimony follows.

Barb Daubner, CYS Casework Manager and Manager to Casework Supervisor Gauthier provided testimony that established that Daubner was an experienced child welfare worker, having come to Washington County CYS in 2019 after working for 34 years in the Allegheny County Office of Children Youth and Families. *Id.* Daubner testified that her job duties

involved managing the Agency supervisors, including supervision of Supervisor Amber Gauthier. However, in contrast to the testimony offered by the Agency Director and Ms. Gauthier, Ms. Daubner testified that she was unaware that Ms. Gauthier was an uncertified supervisor, thus requiring additional oversight in her supervision of cases. Specific to the case at hand, Daubner indicated that **she only "reviewed part" of the case history.** The following exchange occurred at the hearing:

> Q. So when you make any kind of personnel decisions or decisions you give to your subordinates, do you review the case history.
>
> A. I review parts of it, yes.
>
> Q. And did any of your subordinates ever come to you and have questions regarding this case since April of 2022?
>
> A. Yes.
>
> Q. So did you review the case history at that point?
>
> A. I reviewed parts of it, I do believe. I don't recall, actually.
>
> Q. Okay. You don't recall when you reviewed the case history between April 2022 to present?
>
> A. No.
>
> Q. Okay. Were you aware that Ms. Gauthier lacked certification as a casework supervisor?
>
> A. I was not.
> ..............................................
> Q. Okay. So when did you become aware she wasn't certified.
>
> A. Last week.[21]

*Hearing Transcript, Vol. 2, Pages 228-229.*

---

[21] When later questioned about this testimony by the Agency solicitor, Daubner indicated, "I knew she was doing the certification process again, but I wasn't aware that it was because she wasn't certified. It was just a refresher because she was coming back into the agency. *Hearing Transcript, Vol. 2, page 236.*

In further direct contrast from the testimony offered by Director Schlegel, Daubner testified that she was "not sure" if a caseworker lacking certification required additional oversight. *Id. at 230.* Daubner also indicated that she only "read some" of the policies and procedures from CYS and was unaware if those policies discussed her duties in relation to managing an uncertified supervisor. *Id.* Ms. Daubner was unsure if she reviewed and/or created CAPS notes in the present case. *Id. at 231.* Further, although Ms. Daubner acknowledged meeting with Supervisor Gauthier regarding the present case, prior to August 11, 2022, she was **unaware how often or if she ever specifically checked in on the status of this case.**

Ms. Daubner testified that although she believed a risk and/or safety assessment was completed in the present matter, she was not sure when they were completed. Ms. Daubner did acknowledge knowing that Father, Mr. M ____, had a criminal history, but was unaware of when she learned the information. *Id. at 232.* When asked of what specific actions she took in this case between April of 2022 and August of 2022, the following exchange occurred.

> A.  I had discussions about possibly having a team meeting. And I had discussions about the fact that the case needed to be transfer.
>
> Q.  Do you remember when you had those discussions?
>
> A.  June and July.
>
> Q.  **And what happened with the team meeting? Why did that not occur?**
>
> A.  **I don't recall.**
>
> Q.  Okay. You never followed up?
>
> A.  **We discussed the possibility, we didn't request one.**

*Hearing Transcript, Vol. 2, page 233.*

Following acknowledgement that the discussion of the team/teaming meeting was discussed between Supervisor Gauthier and Manager Daubner in June of 2022, additional testimony was elicited, wherein the following exchange occurred:

Q.      Is it customary for you to discuss a team meeting with one of supervisors and then for that meeting not to happen and for there to be zero follow-up about it?

A.      It can happen, yeah. They can talk about whether or not they think there needs to be a team meeting.

Q.      Okay. And what's the discussion about this case and the teaming meeting for it?

A.      I don't recall the discussion with Amber that much, but I knew it was in regards to the in-home services.

….. Court clarification of statement……

Q.      And what other services were contemplated?

A.      Well, drug and alcohol and in-home.

Q.      Okay. Anything else?

A.      I don't recall. We were talking about one of the drug and alcohol in-home services that we thought might be appropriate.

Q.      Okay. And what became of that?

A.      I can't remember exactly which all services we put in, but I do recall that we talked about NPSA. I don't exactly remember.

Q.      Okay. But for NPSA, parents have to demonstrate 30 days of sobriety; correct?

A.      I believe so.

Q.      And isn't it true that Mother was testing positive on a near monthly basis?

A.      I believe so.

Q.      So how could NPSA be a viable option as a service?

Page 26 of 42

A.    We discussed it as a possibility.

Q.    But how is it a viable possibility if Mother is in active drug use?

A.    So we were just going through all of the services we have to see which one would fit the family best.

*Hearing Transcript, Vol. 2, pages 241-243.*

Ms. Daubner further testified that she was unaware if the Agency policies required her to sit in on supervision meetings between the supervisor and caseworker, as testified to by Director Schlegel. *Id. at 239.* [22] The Court found the overall oversight, management, review and response of the caseworker, casework supervisor, casework manager and Agency as a whole unreasonable.

For each of the aforestated reasons, this Court found that the Agency actions, in this case, failed to meet the definition of reasonableness, according to their own outlined standards for general procedures. For the same reasons, this Court found that, the lack of reasonable actions did in fact equate to lack of reasonable efforts. Having made such determination, the Court then sought to evaluate if the lack of reasonable efforts rose to the level of lacking reasonable efforts to prevent removal in light of the overall case history. Accordingly, a detailed evaluation of the specific case history follows.

## VI.    Evaluation of Case History

This Case was first referred to the Agency on April 19, 2022, as a result of Mother being positive for opiates at the time of the birth of K.M.'s newborn sibling. The following day,

---

[22] When later questioned regarding the amount of time taken to transfer the case, Ms. Daubner indicated that Ms. Schilken was busy with several cases. When asked by the Court how it was determined which cases got the most attention, Ms. Daubner testified, "It's usually the ones who are court active or ---yeah. It's mostly those." *Hearing Transcript, Vol. 2, page 249.*

Caseworker Schilken met with Mother, Ms. Mc[...]ght at the hospital, had her sign releases and saw Minor Child K.M. at the home of his grandparents. *See Hearing Transcript, Vol. 1, pg. 34.* This was not the first contact the Agency had with this family. Testimony established that six (6) months earlier, in October of 2021, there was a referral made to the Agency regarding substance abuse and **substance trafficking by Father, Mr. M**[...] *Hearing Transcript, Vol. 1, page 41-44.*

Caseworker did not make contact that day with Father, Mr. M[...], but two (2) days later on April 22, 2022, Caseworker Schilken did make contact with Father, Mr. M[...] by telephone. According to the testimony, Ms. Schilken asked Father what "his" plan was to keep his children safe. Testimony was elicited during the hearing regarding this initial discussion with Father, through which the following exchange took place:

Q. And, Ms. Schilken, were you aware that back in October of last year (2021), there was referral made to the Agency regarding alleged substance abuse and substance trafficking by Mr. M[...]?

A. When I had spoken with him **I knew of his criminal history.** I don't know that I knew of all the prior history with the Agency. I just knew what I had been involved in previously.

Q. Okay. So you were aware that Mr. M[...] had a **criminal history that included** violence offenses and **drug-related offenses,** correct?

A. I was, yes.

Q. But you were unaware that back in October of last year, that there was a referral and that **Father had refused drug and alcohol evaluation and drug and alcohol testing by the Agency?**

A. **I didn't know that on the 22nd. No.**

Q. When did you eventually learn of that... or actually, did you ever learn of that?

A. **I did review his past involvement. I don't know exactly when I did that.**

Q. So knowing that Mr. M had an extensive criminal history, a history with the Agency, **you still felt that he was a good protective capacity for the children**, who one was a newborn infant and another who was a little over a year old?

A. *I don't make those decisions. I provided the information to my supervisor.*

Q. And for the record, who is your supervisor

A. It's Amber Gauthier.

Q. Okay. So on April 22, after you spoke with Mr. M , did you have a conversation with your supervisor.

A. I actually sent a text message with all of his criminal history.

*See Hearing Transcript, Vol. 1, page 35.* Testimony continued:

Q. And what was the substance of that conversation?

A. She had texted—Amber had texted me that Barb Daubner (Casework Manager) had said that **Father had some criminal history but didn't know what it was**. And I replied that **I knew he had a criminal history, and I texted all of the different years, the offense, the grading, and also included that there was an SPLC (Subsidized Permanent Legal Custodian) with some other children**, so that they had that information.

*See Hearing Transcript, Vol. 1, pgs. 41-44.*

**An in-person assessment was not completed with Father**, despite acknowledgement of his recent criminal history and recent history with the Agency.[23] Caseworker Schilken indicated that at the time of initial referral she was instructed by her supervisor, Amber Gauthier, to follow the family's identified plan for safety for the children. This plan involved Father serving as the supervisor to Mother. "After I notified of the charges and everything that he had, she [Amber Gauthier] had indicated that even given those—his criminal history—that he's the biological

---

[23] On October 2, 2021, the Agency received a report alleging that Father, Mr. N , sells cocaine, heroin, and pills. The Agency reported that their assessment established that Mr. N did not reside in the family home and was not responsive to the attempted assessment. The Agency further reported that Ms. M , Mother, was cooperative with the assessment and the home was determined to be appropriate with the case being closed on November 4, 2021. *See Shelter Care Order of August 12, 2022, pg. 3.*

father, and, you know, they have rights, and, essentially, we were moving ahead with that plan. That was the "family plan." *Hearing Transcript, Vol. 1, page 104.* Interestingly, Caseworker Schilken **did not conduct a drug test of Father until weeks later** and the test at that time was unobserved due to the Caseworker being of the opposite sex of parent.[24] *See Hearing Transcript, Vol.1, pg. 43.*

Initial testimony received from Casework Supervisor Amber Gauthier was consistent with this account of Caseworker Schilken. Gauthier confirmed that she did a brief review of the closing summary involving the family's previous involvement with the Agency and directed the Caseworker to conduct a safety assessment. Consistent with the testimony of Caseworker Schilken, Gauthier testified that, with the assistance of her Casework Manager, Barbara Daubner, it was decided that Father would have the protective capacity to supervise Mother's contact with K.M. and his newborn sibling. *See Hearing Transcript, Vol. 2, pages 151-153.* Gauthier testified that she did not direct the caseworker to randomly drug test Father.[25] Contrary to the testimony offered by Schilken, Gauthier testified that she was unaware of Father's criminal history involving violent and drug offenses and was further unaware that other children of Father

---

[24] Q. And were either or both of them drug tested?
    A. I attempted to drug test the mother. She was unable to produce a sample. I was, however, able to drug test the father. Yes.
    Q. And how were (sic) able to drug test him? Can you describe how that happened.
    A. I did a urine drug screen.
    Q. Did you observe that test?
    A. I'm not permitted to.
    Q. Okay. That's per your policies and procedures; correct?
    A. Correct.

Caseworker did check the bathroom for stored urine but did not test Father for devices on his person. See *Transcript, Vol. 1, Pages 49-50.*

Through the later testimony of Director Schlegel, it was learned that Ms. Schilken had the ability to conduct an oral swab test on Father. *See Hearing Transcript, Vol. 2, page 137.*

[25] Gauthier indicated that she later became aware that Father had previously refused drug and alcohol services by the Agency during his open case in October 2021. *See Hearing Transcript, Vol. 2 at pg. 157.*

were subject to a permanent legal custodianship due to drug related reasons. *Id.* Gauthier testified that, she believed that she did not learn of this information until after the newborn's death on August 11, 2022. *Id.* When asked if part of her job duties involved review of the entire case file history of a family, Ms. Gauthier testified, "**Yes, now it is**. . . After we had our investigative practice training[26]." *Id. at 153.* Gauthier testified that the training took place within the past month. Gauthier testified that **no other investigation was done by her individually and/or her manager** to determine whether Father was appropriate to serve in a protective capacity. *Id. at 154.*

At the time of Mother's discharge from Magee, she was enrolled in a drug and alcohol program affiliated with the hospital. *See Hearing Transcript, Vol. 1, pages 121-122.* Mother was unsuccessfully discharged from the drug and alcohol program. *Hearing Transcript, Vol. 1, pages 121-122.* The Agency made a referral for a drug and alcohol evaluation of Mother on April 25, 2022. Mother complied with this referral and was recommended for outpatient treatment. Shortly thereafter, while at an appointment in Pittsburgh for Mother, the Agency received another referral that **Mother tested positive for fentanyl and there were "allegations that both parents appeared to be under the influence."** *See Hearing Transcript, Vol. 1, pg. 4.* In response to the referral, the Caseworker went to Mother's home on May 5th, but was unable to make contact with the family after two (2) separate visits to the home and a visit to paternal grandparent's home. *Id. at 47-48.* Finally, at 2:00 a.m. on May 6, 2022, the Caseworker was finally able to make contact with the family. It was during this visit that the only drug test of Father was conducted through an unobserved collection. In later testimony, Agency Director, Anne Schlegel testified that only **providing one (1) unobserved drug screen to Father**, in

---

[26] Gauthier testified that the training took place within the past month. *Hearing Transcript, Vol. 2 at pg. 153.*

consideration of his criminal history, drug use history and history with the Agency "**did not align with the standards of the agency.**" *Hearing Transcript, Vol. 2, pg. 100.*

Five (5) days later, on May 11, 2022, Caseworker Schilken made a referral to Pressley Ridge Crisis Services. The referral indicated,

> "the Agency received a referral on 5/6 … while in our office, S⸺ (Mother/M�⸺) **appeared to be visibly intoxicated, overly sedated, slowed speech and response time when conversing.**"

*See Hearing Transcript, Vol. 1, pg. 54.* The referral continued:

> "S⸺ **had previously admitted to her partner, who is the other primary caregiver of the children, is actively using illicitly.** S⸺ **confirmed this again at this appointment on 5/5 that her partner is also in active use.**"

*Id.* The Agency represented that the Crisis in-home services were referred with a goal of "assisting Ms. M⸺ in establishing herself with a drug and alcohol treatment provider and ensuring that the family is linked to community resources and services." *See Shelter Care Order of August 12, 2022, pg. 2.* There is no evidence that Crisis made this establishment. Additionally, **no assessments or "referrals" were made with regard to Father.**

Caseworker testified that the Agency policy is for intake to work with a family in an attempt to resolve matters so a case doesn't have to move on. "**If we can't get the issues rectified, then it would move on to ongoing.**" *Hearing Transcript, Volume 1, pg. 109.* Here, the referral was for Crisis services. **Crisis services** are considered **the highest level of service** by the Agency and was referred very early on in this case.[27] Pursuant to testimony,

---

[27] See Hearing Transcript, Vol 1, pgs. 96-97:

> Q. And just for the record, what are crisis services?
> A. Crisis services, they go in and work usually they go in initially and work very intensely with the family to solve an issue, to get them involved with drug and alcohol or –
> Q. Who is "they"?
> A. In this case, it was Pressley Ridge that referred.

Crisis was scheduled to be in the home at least twice per week, but in actuality **only provided once a week service.** *See Hearing Transcript, Vol. 1, pg.117.* In addition to testifying that Crisis services was to be in-home twice a week, but only visited once a week, Schilken agreed that Crisis services are a five (5) to ten (10) hour a week service. *See Hearing Transcript, Vol. 1, pg. 248.*

The record reveals that there was **no clear picture of the actual actions of Crisis services in this case.** Casework Supervisor Gauthier testified she recommended a drug and alcohol evaluation, crisis, and STOPP services. *Hearing Transcript, Vol. 2, pg. 158.* Gauthier indicated that Crisis Services would be in the home **"at least up to five (5) times a week" and Stop services is "just a notch below that at three (3) to five (5) times a week."** *Id.* Gauthier was unable to respond as to **whether the services were actually implemented** and thereafter appeared to have a less than clear picture of events that transpired and/or whether **referred serves were actually implemented or cooperated with in the household.**[28] *See Hearing Transcript, Vol.2 at pgs. 158-184.*

---

Q. Okay. And do you know what specific services Pressley Ridge was offering the family during the pendency of this matter?

A. They were referred in to try—to ensure that she was following through with the drug and alcohol before— I guess, I don't know what date.

.................................. *and continuing*....................................

A. So when I met with the mother at the hospital, she had said that she was involved in drug and alcohol services. They were put in to ensure that she was maintaining those services. They were working with her in the home.

---

[28] When asked about specific contacts, communications and compliance, Caseworker Gauthier indicated a lack of specific knowledge. In example:
- When asked about typical actions taken when a family is less than cooperative, Gauthier indicated that the service provider and the Agency meet with the family. Gauthier was unsure if it that happened in this case.

Upon questioning regarding the purpose of services generally, Schilken testified that, "in making these referrals, that's to help them—in this case—to address the drug issues, to help provide rides, get them involved with any kind of services like community services, if they are having financial issues." *See Hearing Transcript, Vol. 1, pages 62-63.* Schilken continued, "That's what those services in intake are designed to do, to get the family to a point where if they don't require ongoing services, then, you know, we can take care of that in intake." *Id.* Agency Director Anne Schlegel testified that "services are based on the needs of the family, so it's services that will reduce the risk of harm to the children and/or ensure the child's safety. See *Hearing Transcript, Vol. 2, pg. 76.* Schilken indicated that when a family doesn't cooperate, the Agency attempts to put in a different service "to try different levels to try and work with the family." Despite this testimony, Schilken agreed that **Crisis, is the highest level of service and was implemented by the Agency very early in the case.** *Id.*

Director Schlegel had a somewhat similar understanding of the Crisis Services, as demonstrated in the following exchange regarding Pa Code §3130.35:

---

- Ms. Gauthier was unsure if and/or who would have communicated to the family what the Agency was requiring of them.
- Ms. Gauthier made a referral on May 16, 2022 for a family group decision making/rapid response meeting that she agreed should occur within 72 hours of referral, but was unaware of why the meeting did not commence until June 3 of 2022.
- Gauthier believed that a provider was put in place for "the financial end of things" but was unsure of when the referral was made, what provider or whether the services were actually provided.
- Gauthier was unaware of a new service recommended at the end of June because Crisis services was no longer in the home.
- Gauthier was not "super familiar" with what family behavioral therapy services involved, yet she "possibly" made a referral for these services in late July of 2022.
- Gauthier is unaware of why a lesser degree of service was recommended in July when Crisis services were recommended at the end of June and the family failed to cooperate.
- Gauthier was unable to recall if she made service referrals in this case or if the decisions were made by her Caseworker or directed by her manager.
- Gauthier was unaware if FBT service intake occurred, but believed it did not occur.

Which concerning the information that Ms. Gauthier indicated she "did not know" or was "unaware of" until later, leaves questions regarding the information shared.

Q.   And it indicates these are placement prevention reunification services?

A.   That is correct.

Q.   And then it says placement prevention reunification services include all the following. It has a list of four: Counseling, parenting, homemaking and part day service; right?

A.   That is correct.

Q.   And in this case you had indicated that counseling services were offered to the family in April when they first entered the services of the agency; correct?

A.   They were offered and provided. **(Emphasis Added)**

Q.   Okay. And what about parenting education?

A.   Offered and provided.[29] **(Emphasis Added)**

Q.   And who provided the parenting education?

A.   That's Pressley Ridge.

Q.   Okay. And that is part of crisis services?

A.   That is.

Q.   Okay. What are crisis services?

A.   It is a service that we will address any need that is identified by the agency and by the family, but they are available to start with the family immediately. There is no waitlist for it. They can start with the family that day. It is an intensive service, so the agency would outline how often that service should be in the home.

. . . .

Q.   Are there specific services offered within crisis services?

A.   So crisis services provide a wide range of services. They connect to community resources. They will help the family connect to whatever, maybe a drug and alcohol evaluation or a psychological evaluation, whatever that need it. They will offer parenting support. There is support

---

[29] It should be noted, no other Agency representative indicated that parenting education was provided to the family, however, as questions continued, it became apparent that "offered and provided" meant that the Agency made a referral for the services.

with concrete goods, so it's a variety of services that the crisis services provide.

Q.  The statute also indicates homemaker and caretaker services. Do you know whether or not that type of service was offered?

A.  That's all part of crisis services.

Q.  So to serve as part four (sic), part-day service, that would have been offered?

A.  That is correct.

Q.  Okay. **Do you know whether or not Pressley Ridge in fact offered those services to the family?**

A.  I know that <u>Pressley Ridge attempted to offer</u> the services to the family.

Q.  And when you say attempted, what do you mean?

A.  **They were referred.** Their goals were outlined for them; however, <u>the family did not cooperate with the services</u>.[30]

*Hearing Transcript, Vol. 2, pgs. 77-79.*

Additional testimony and evidence demonstrates that Crisis services were not

providing the level of service specific to the primary concerns of the Agency and Crisis was

---

[30] The referral form, called an "In-home Provider Referral Form" that is utilized by the Agency is a pre-printed form that permits the person submitting the form to add details of the family- check certain boxes and provide a narrative. See attached In-Home Provider Referral forms of 5/11/2022, 6/29/2022, and 7/21/22. The referral of May 11, 2022 indicates that the children are in significant risk of entering foster care but can remain safely at home with prevention services. Services are requested immediately for 5-10 hours per week as STOPP/Crisis. The narrative provides case history beginning with Mother's positive for opiates at the birth of K.M.'s infant sibling. The referral also provides information regarding the referral on 5/6/2022 regarding both Mother and Father. Reference is made to the "family plan" with Father supervising contact and information is provided regarding contact information provided to Mother. The referral also provides general goals and checks off pre-printed boxes indicating the "Family Needs/Concerns" include: Community Supports, Family Resources, Substance use/abuse, and transportation.

The June 29, 2022 referral provides the same information and also includes an update to reference earlier treatment with Crisis that was closed when Mother went to rehab. The referral indicates that Mother left rehab AMA on June 23, 2022, however the Caseworker only became aware of this on June 28, 2022. The referral also indicates that Mother tested positive for cocaine and fentanyl during the visit. Caseworker includes information regarding financial issues and delinquency notices, unpaid fines and taxes. The referral requests for Family Needs/Concerns remain the same.

tasked with providing services with incomplete and/or inaccurate information. In actuality, the Washington County Provider Case Summary for Pressley Ridge Crisis indicates the following contacts between May 15, 2022 and June 16, 2022:

| Date of Contact | Type of Contact | Hours: |
|---|---|---|
| 5.15.2022 | Phone | 0h03m |
| 5.16.2022 | Phone | 0h03m |
| 5.17.2022 | Face to Face | 1h37m |
| 5.19.2022 | Phone | 0h03m |
| 5.19.2022 | Face to Face | 1h37m |
| 6.1.2022 | Face to Face | 1h47m |
| 6.2.2022 | Phone | 0h11m |
| 6.3.2022 | Phone | 0h04m |
| 6.3.2022 | Telehealth | 1h00m |
| 6.13.2022 | Phone | 0h30m |
| 6.14.2022 | Phone | 0h16m |
| 6.15.2022 | Phone | 0h03m |
| 6.16.2022 | Phone | 0h05m |
| 6.16.2022 | Phone | 0h02m |
| 6.16.2022 | Face to Face | 2h02m |
| | | |

Establishing that for the month, Crisis Services only provided a total of 9.23 hours to the family, with only 7.03 hours being face to face contact, during the period of a month and including a gap in service of over a week and a half in May and a gap of ten (10) days in June.[31]

Other than reports of case history involving substance abuse, and reports regarding Mother's attendance at Crossroads Treatment Center for suboxone treatment, which were erroneous, the Pressley Ridge report gives no indication of services provided by Crisis related to connecting or establishing Mother with a support for substance abuse.[32] It is presumed that some

---

[31] Although no direct testimony or evidence confirms the conclusion, it is presumed from review of exhibits that a portion of the lapse in service is attributed to a reported lice infestation in the home. Although even this is questionable considering it wouldn't prevent the phone contact previously initiated.

[32] In Key Communication from Pressley Ridge Crisis for the date span of May 15, 2022 until May 19, 2022: indicate: NM's mother attends Crossroads Treatment Center in Canonsburg, PA due to substance abuse issues (completes drug and alcohol screens; receives medication management services and takes Suboxone; appointments are bi-weekly; she does not know last appointment date and does not know next appointment date/time)

In Key Communication from the date span of June 1, 2022 until June 3, 2022:

NM's mother completed a meeting on 6.1.22 in order to review resource and service options available to the family in assisting them financially (BluePrints (early intervention program, continuing education program, Linkedin); Genesis (car seat, clothes); Catholic Charities (formula, diapers, therapy); PA Department of Public Welfare (food

type of discussion of substance abuse took place inasmuch as the Crisis worker notified the Agency of Mother's intent to go to rehab. But the record is absent of anything more supporting this conclusion. Further, other than testimony of former Deputy Director, Angela Filotei, in rebuttal of testimony provided by Agency Casework Manager Daubner, the Agency presented no testimony or evidence supporting the effectiveness of referrals, the follow-up with referrals or the appropriateness.

As stipulated to during adjudication, from May 15, 2022 until June 16, 2022 Crisis Services were supposed to be in the home. But as previously noted, this referral was fraught with problems. During an unannounced visit to the home on June 2, 2022, Caseworker Schilken drug tested mother and she was positive for fentanyl, but not her prescribed buprenorphine. As a result, a Family Group Decision Making Meeting (FGDM) was scheduled for the next day and Mother was referred for another drug and alcohol evaluation which ultimately recommended in-patient treatment. On June 3, 2022, the FGDM meeting was commenced but not completed because Mother obtained an appointment at Crossroads.[33] The record establishes that a follow-

---

stamps, subsidized childcare services); Hands and Feet Project (clothes and outfits for the children); Diaper Bank (diapers, formula); and basic utilities (water, electric, heat)).

NM's mother and father completed an emergency Family Group Decision Making Meeting on 6.3.22 via telehealth (the meeting was established by CYS; the meeting was necessary due to mother failing a drug screen on 6.1.22 administered by CYS; mother tested positive for Fentanyl; there is currently a family plan in place whereas father must be present to provide supervision when mother is with the children; a Crisis/Rapid Response Family Meeting Report was provided detailing the concerns and actions that the family will take in adhering to CYS; a follow-up meeting will be established within the next week; the meeting was facilitated by Justice Works)

*See CYS Hearing Exhibit A8.* Notably, no drug or alcohol service is listed.

*The June 1, 2022 through June 3, 2022 communication fails to acknowledge that the Family Group Meeting was NOT completed because Mother obtained an appointment with Crossroads. Documentation and testimony of Mother's Crossroads appointment calls into question information regarding documents indicating that Mother is attending Crossroads treatment. No party has submitted documentation supporting treatment of Mother at Crossroads, in fact, in CYS Hearing Exhibit A10 The Washington Drug and Alcohol Commission CYS Referral, it is noted that Mother was "seen at Crossroads on 5/14/2022 for a readmission appointment, this was the only time she was seen."*

[33] It was later learned that Mother was non-compliant with the treatment intervention. *See Shelter Care Order of August 12, 2022 at pg. 3.*

up FGDM meeting was to be scheduled by the Agency, but never occurred. On or around June 9, 2022, Mother was accepted to an inpatient drug treatment program but was unable to attend due to a lice infestation in the home. On June 16, 2022, Mother entered in-patient rehabilitation. Unfortunately, Mother left rehab against medical advice (AMA) on June 23, 2022. *See Hearing Transcript, Vol.1, pg. 57.*

Five (5) days later, Caseworker Schilken learned that Mother had left rehab AMA. In response, the Caseworker went to the home and drug tested Mother who was positive for cocaine and fentanyl. *See Hearing Transcript, Vol. 1, pg. 57.* Father was present, but Agency notes indicate that he was unwilling to have serious discussion about Mother's relapse. Father did discuss the financial stresses of the family.

On June 29, 2022, despite the previous ineffectiveness of the service, Caseworker Schilken made a second referral for Pressley Ridge Crisis Services. *See Hearing Transcript, Vol. 1, pg. 57.* This referral provided information similar to the first referral, but updated events following Mother's untimely departure from rehab. In addition, on the same date, Supervisor Gauthier made an informal referral for a follow-up FGDM meeting with JusticeWorks. However, after **Father indicated an unwillingness to participate,** the Agency made no further attempts to schedule the meeting.[34] Interestingly, testimony establishes that, on the same date, **Father texted** Caseworker Schilken and asked **what the goals were to get the case closed.** Father stated, "**I just feel there's no goals set for that and that's my main concern.**" Gauthier testified that she was aware that Father had requested clarity of the family goals to get the case closed, but she was unaware of what actions were taken by Caseworker Schilken to address these concerns. *Hearing Transcript, Vol. 2, pg. 191.*

---

[34] Gauthier testified regarding the follow-up, "Mom and Dad said that they didn't have enough supports, and it was a waste of everyone's time." *Hearing Transcript, Vol. 2, pg. 154.*

Throughout the month of July, the Agency CAPs notes have references to the next step in the case is for transfer. The case was not prepared for transfer throughout July and despite the Family's failure to cooperate, the unaddressed Agency referral issues, and no new documented or stated assessment, no appreciable change was made in the Agency response. Then, on July 21, 2022, another referral was made to Pressley Ridge, this time for Family Behavioral Therapy (FBT), a step-down from the earlier, referred service. Multiple attempts were made to schedule the FBT in-home services, but all were cancelled by Mother. **Fifteen (15) days later,** Caseworker Schilken learned of the failed attempts. Another appointment was scheduled for August 9 and Mother again cancelled.

It was only at this time, according to Caseworker Schilken, on August 10, 2022, she began drafting her case transfer summary. *Hearing Transcript, Vol. 1, pg 78.* Unfortunately, on August 11, 2022, K.M.'s infant sibling was found unresponsive in the home and upon emergency transport to the hospital was pronounced dead. Upon initial response to the home, law enforcement documented drugs and paraphernalia, including a glass crack cocaine smoking pipe throughout the residence. During a subsequent search, law enforcement located multiple fentanyl/cocaine stamp bags, a marijuana pipe and a glass crack pipe. Several items were found in the room where K.M.'s infant sibling was found unresponsive. K.M. was evaluated at Children's Hospital and discharged, however medical staff directed his return to the hospital after **his urinalysis tested positive for cocaine, cocaine metabolites and fentanyl.**

Parents fled the hospital and were later charged by law enforcement. They failed to appear for the shelter hearing in the case but were later apprehended by law enforcement on August 19, 2022. Both parents are housed at the Washington County Correctional facility facing

multiple charges, including an amended charge of Criminal Homicide related to the death of K.M.'s infant sibling.

VII.    Conclusion

The ultimate cause and manner of death of K.M.'s sibling will be determined through the criminal court proceeding and nothing in this Court's decision should relieve responsibility for actions that parents took in this matter. However, this Court was not tasked with evaluating the actions of parents. Here, the Court was tasked with determining whether the Agency exercised reasonable efforts in preventing or eliminating K.M.'s removal from the home. At shelter, with parent's incarcerated and a deceased sibling, options to provide additional and/or alternate in-home services, to provide for short term placement, engage the Court to assist compliance, or to alter the Agency response in any way were eliminated.

At the time of adjudication, however, the Court was tasked with looking at what efforts had been undertaken prior to the removal and whether they were reasonable. While the Agency argues that any effort should obviate a finding of lack of reasonable efforts, that would dismiss the requirements of 42 Pa. C.S.A. § §6351(b). Based on the testimony and evidence offered, this Court found that the efforts undertaken by the Agency were not reasonable.

By failing to follow their own internal policies and procedures, the case lacked the oversight to provide for appropriate and reasonable assessments, actions and responses. And although K.M. will likely never return to his family and the impacts to the Agency will only involve financial inconveniences[35], this Court's decision finding a lack of reasonable efforts is

---

[35] Our Supreme Court has "encouraged [trial court] to communicate clear expectations to the agency given that a finding of reasonable efforts are lacking will have a 'significant impact' on the financial resources available to assist children and their families. *In re D.C.D.*, 105 A.3d at 65, citing the *Benchbook at 19.9.1 of the 2014 edition.*

the right and just decision. A contrary finding, in light of Agency policy and procedure and simple common sense, would be granting the Agency the ability to fulfil reasonable efforts by simply checking boxes with provider names on pre-printed sheets and slipping the same under the door of a family, all while knowing the primary problem continues behind that door. That simply is not reasonable.

By testimony of the Agency representatives, they did not follow their own policies and procedures, they were non-compliant with state policies and procedures, they did not do an appropriate assessment, and failed to follow-up. In short, the actions undertaken were not done with even minimal effort to address the primary concerns in the present case, the history with the Agency or the potential for future risk and/or harm to the family. This Court did not commit an abuse of discretion in finding lack of reasonable efforts to prevent and/or eliminate removal and respectfully requests that its decision be supported and affirmed.

Respectfully Submitted,

Traci L. McDonald, Judge

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
JUVENILE DIVISION

IN THE INTEREST OF:

K.M.                          CP-63-DP 64-22
(DOB 4/24/21)

A MINOR CHILD.



TYPE OF PLEADING:

**CONCISE STATEMENT OF MATTERS
COMPLAINED OF ON APPEAL FILED
PURSUANT TO PA.R.A.P 1925(B)**

FILED ON BEHALF OF:

WASHINGTON COUNTY CHILDREN
AND YOUTH SOCIAL SERVICE
AGENCY

COUNSEL FOR THIS PARTY:

JOSEPH ASKAR, ESQUIRE
SUPREME COURT NO. 79630

295 THIRD STREET
BEAVER, PA 15009

(724) 622-1499

RONALD D. ROJAS, ESQUIRE
SUPREME COURT NO. 79121

240 COMMERCE STREET
BEAVER, PA 15009

(724)775-7311


RECEIVED
FEB 07 2023
11:52 am
By JUV Records Dept

**CHILDREN'S FAST TRACK**

Appendix C